Filed 6/20/14

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B248615 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA056655) |
| v. | |
| CARLOS REGINALDO DELAROSARAUDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge. Affirmed and remanded with directions.

Carol S. Boyk, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret A.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Factual Background and parts A, B, C and E of the Discussion.

Maxwell, Stephanie C. Santoro, and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Carlos Reginaldo Delarosarauda appeals from a judgment and sentence, following his convictions for corporal injury to a co-habitant, assault, and misdemeanor vandalism. He contends his convictions should be reversed, as (1) the trial court committed misconduct during voir dire; (2) the court admitted testimonial hearsay in violation of his right to confront the witness under the Sixth Amendment of the federal constitution; and (3) there was insufficient evidence to support the vandalism conviction. He further contends the court lacked authority to issue a protective order forbidding him to contact his son and stepdaughter for the next 10 years, except through counsel. The People request that this court amend the abstract of judgment to correct appellant's presentence custody credits and otherwise affirm the judgment.

In the unpublished portion of our decision, we affirm the convictions and remand the matter with directions to the superior court to modify the abstract of judgment to correct the amount of presentence custody credits. In the published portion of our decision, we conclude the court lacked authority to issue that portion of the protective order barring appellant from having contact with his son and stepdaughter, as they were not "victims" within the meaning of Penal Code sections 136.2, subdivision (i)(1) and 273.5, subdivision (j).[1] Nor was the postconviction protective order authorized under section 136.2, subdivision (a)(6). Accordingly, on remand, the court is directed to vacate the protective order with respect to them.

---

[1] All further statutory citations are to the Penal Code, unless otherwise stated.

2

# PROCEDURAL HISTORY

An information charged appellant with corporal injury to a spouse or cohabitant, Mirian Jackeline Baquedano (§ 273.5, subd. (a); count 1), assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), assault with a deadly weapon (§ 245, subd. (a)(1); count 3), and misdemeanor vandalism (§ 594, subd. (a); count 4).  As to count 1, it further alleged that appellant personally used a deadly and dangerous weapon, a rope (§ 12022, subd. (b)(1)).  Appellant pled not guilty and denied the allegation.

Trial was by jury.  During voir dire, the trial court made certain remarks to the jury in response to comments by some prospective jurors.  The court asked the jurors if they were comfortable with the concept that some victims of violence may be reluctant to assist in prosecuting the person who committed the violent acts, that victims may be reluctant to testify for or against the accused perpetrator, and that they may still have feelings of love and loyalty for the accused.  During a recess, defense counsel objected to the court's remarks, and moved for a mistrial.  The court denied the motion.

The jury found appellant guilty as charged, and found true the deadly weapon allegation as to count 1.  The trial court sentenced appellant to a total of five years in prison and one year in county jail.  As to count 1, the court imposed the upper term of four years, plus one year for the deadly weapon enhancement (§ 12022, subd. (b)(1)).  As to counts 2 and 3, the court imposed the upper term of four years on each count, but stayed the sentences pursuant to section 654.  As to count 4, the court sentenced appellant to one year in county jail, consecutive to the prison sentence.  Appellant was awarded 652 days of presentence custody credit, consisting of 326 days of actual custody and 326 days of conduct credit.  The court also imposed various fines and assessments.

3

Finally, the court issued a criminal protective order as to Baquedano and her two children for the duration of 10 years. Among other provisions, appellant was ordered not to contact the protected parties, except through defense counsel.

Appellant timely filed a notice of appeal.

## FACTUAL BACKGROUND

A. *The Prosecution Case*

1. *The Victim*

Baquedano testified at trial. She stated that she initially had refused to testify against appellant because as an undocumented immigrant, she was afraid she would be deported. In June 2012, Baquedano was in a relationship with appellant. They had lived together for five years, and had a three-year-old son (Jeffrey). Baquedano had another child not fathered by appellant, six-year-old Kiarah. Baquedano and appellant had been having arguments about Kiarah. During the arguments, appellant used foul language, called Baquedano a "whore," said he was going to take her child away, and broke her cell phone.

On June 25, 2012, Baquedano and appellant agreed to separate because she was not comfortable in the relationship. Although appellant had said he would change, he was becoming more aggressive. In addition, when appellant was in jail a second time, Baquedano had met another person.

The following morning, Baquedano was in bed when appellant came into the bedroom with what appeared to be a shoelace.[2] Appellant got on top of Baquedano and placed her hands at her sides. He placed the cord on her neck and said, "I'm going to kill you because you can't leave me." Appellant pulled on the cord. Baquedano told him, "Let me go," and tried pushing him away. She put her hand

---

[2] Baquedano variously described the item as a shoelace or a rope. According to appellant, it was "a braided nylon cord about one-eighth inch in diameter."

4

on her neck to try to pull the cord away because she could not breathe. Appellant held the cord around her neck for two minutes. Baquedano thought appellant was going to kill her and was scared. She finally pushed appellant off. He let go of the cord and apologized.

The children were in the living room, and Baquedano did not see Kiarah come into the bedroom during the incident. Baquedano told appellant she was going to go see the children. He lay down on the bed "like nothing had happened." Baquedano left the room, went upstairs, and called the police. Her 911 call was played for the jury. During the call, Baquedano stated she needed assistance because her husband had just hit and tried to choke her.

Baquedano testified she whispered on the 911 call because she was worried that appellant might hear her and hit her again. She was only a little worried about her children because appellant had "never touched them." Baquedano confirmed that appellant hit her two times on her left cheek during the incident. The strikes did not leave a bruise.

In contrast, the cord left marks on her neck, and photographs showing the marks were published to the jury. After the incident, Baquedano had difficulty breathing and frequently had nightmares about appellant wanting to choke her.

On cross-examination, Baquedano stated that she agreed to testify against appellant after learning that she could qualify for immigration relief if she was a victim of domestic abuse and helped in the prosecution of the abuser.

2. *The Law Enforcement Investigation*

Los Angeles Sheriff's Department Detective John Amis, along with two other police units, responded within minutes to Baquedano's 911 call. After appellant was detained and placed in a patrol car, Detective Amis, Deputy Kris Mason and Detective Thomas Kim (who acted as an interpreter) interviewed

5

Baquedano and Kiarah separately at the house. According to Detective Kim, Baquedano appeared upset and scared, and was teary-eyed. She did not readily volunteer information, seemed "like a typical victim that's been through a traumatic incident," and appeared ashamed and fearful. Detective Kim opined that it was normal to see minor inaccuracies in a witness or victim's statement.

Kiarah was interviewed about 30 minutes after Deputy Amis arrived. The interview began in the living room and moved to the bedroom. Kiarah looked upset, nervous and shaken. It appeared she had been crying. Detective Kim asked Kiarah if she knew where the cord used against her mother was located. Kiarah said yes, and she took the detectives to a nearby closet, retrieved a cord, and gave it to Detective Amis. Detective Kim asked her why the cord was in the closet. Kiarah said that she had put it in the closet because she was scared appellant was going to use it again on her mom. Kiarah said that when she heard her mother scream, she went to the bedroom. She saw appellant on top of her mother with the cord near her throat. She was unable to explain what appellant did with the cord. At some point, she saw appellant punch her mom. When appellant discarded the cord, Kiarah picked it up and hid it in the closet.[3]

After the interview, Detectives Kim and Amis received information that appellant was hitting his head on the window of the patrol car. They went outside and saw appellant banging his head against the driver's side rear window, causing

---

[3]    The prosecution did not produce Kiarah as a witness. At sidebar, defense counsel objected to allowing Detective Kim to testify about what Kiarah had said during her interview. The trial court permitted the testimony, finding Kiarah's statements admissible under Evidence Code section 1240 as spontaneous statements. The court stated it did not find the statements testimonial, as the officers were still trying to assess the situation. Finally, the court indicated that Kiarah's statements could be admitted for the purpose of showing her state of mind and explaining the presence of the cord in the closet.

it to shatter. After they told appellant to stop, he began hitting his head on the metal cage separating the front and back seat. The cost of replacing the broken window was less than $400.

Mary Reina, a registered nurse who had seen over 100 cases of strangulation, conducted a domestic violence examination of Baquedano. During the examination, Baquedano reported difficulty breathing, a headache, swelling, neck pain, scratch marks, and bruising. She complained of tenderness in her neck, and said that she almost passed out during the struggle. Reina observed a linear abrasion across the surface of Baquedano's neck, consistent with strangulation by a shoestring-type cord or ligature. There also were several small marks below the linear abrasion that represented bruising, redness, and tenderness in that area. The back and side of the neck evidenced that a ligature had been wrapped around that area. Reina further observed petechiae (small broken blood vessels) on Baquedano's neck. On cross-examination, Reina stated that during the examination, Baquedano indicated that appellant had bitten her lip. Baquedano never told Reina that she had nightmares about appellant wanting to choke her. Finally, Reina could not say with certainty whether the injuries were self-inflicted, or caused by someone other than appellant.

### 3. *Prior Incidents of Physical Abuse*

Baquedano testified that appellant was violent and had physically injured her on two prior occasions. The first incident occurred on December 28, 2010. Baquedano and appellant had an argument about bringing Kiarah with them when they were taking Jeffrey to a clinic. When they came back from the clinic, appellant said that he preferred his son, Jeffrey, over Baquedano's daughter, Kiarah. Baquedano said she loved them both because they were her children. Appellant grabbed a wooden or plastic spoon and hit Baquedano's legs and arms

7

repeatedly, leaving bruise marks. Baquedano's brother called the police, and appellant was arrested. Baquedano spoke with the officers, but did not go to court because she was scared of appellant.

The second incident occurred on November 23, 2011. Appellant became angry when he learned Baquedano had not paid the rent. He pulled her hair and punched her in the face. He then hit her in the face with a shoe, leaving a bruise or abrasion on her right cheek. He also struck her with a cell phone charger, which left a mark on her elbow. Despite these two incidents, Baquedano chose to stay with appellant because she wanted Jeffrey to know his father.

B. *The Defense Case*

Appellant did not testify. Deputy Mason testified he spoke to Baquedano and Kiarah, and prepared the police report of the incident. Baquedano did not tell him that appellant bit her lip. Kiarah did not say that she saw appellant hold the string around Baquedano's neck. Kiarah stated that she saw appellant with the string, but he was not "actively choking" Baquedano with it. Kiarah stated that she hid the string because she knew appellant had done "something bad" with it.

**DISCUSSION**

Appellant contends (1) the trial court committed misconduct when it made remarks during voir dire that tainted the jury pool; (2) he was denied his fundamental right to confront adverse an witness when the court permitted the prosecutor to present the hearsay statements of Kiarah; and (3) there was insufficient evidence of appellant's malicious intent to support the vandalism conviction. Appellant further contends the court lacked authority to issue a protective order prohibiting him from having contact with his son Jeffrey and his stepdaughter Kiarah for the next 10 years, except through counsel. The People

8

contend there was no reversible error, but request that this court amend the abstract of judgment to correct appellant's presentence custody credits.

    A.    *Judicial Misconduct*

        1.    *Relevant Proceedings*

During voir dire, prospective Juror No. 15 stated that his daughter had been a victim of domestic violence at the hands of her husband. Following the husband's arrest, his daughter reconciled with her husband and was not entirely cooperative with law enforcement because she wanted someone to provide for the house. The trial court then told the jury panel:

> "This is a very real issue. Is everybody comfortable with concept -- the concept, and that this doesn't just have to be domestic violence, it can be violence on other levels with people they know and care about, that the victims may be reluctant to cooperate or prosecute or initiate contact with law enforcement for feelings of love, loyalty, financial, that it's a very real concern for her, that she's got a family she needs to take care of and a home to provide for, and that is a factor that would affect why she may be reluctant to cooperate, and [prospective Juror No.] 15 is just highlighted as one of the many issues that go on in a social dynamic relationship.
>
> "And this can be amongst other family members, it's not just domestic violence, it's a variety of areas. Does everybody understand that there may be times where someone can be hurt at the hands of someone they love, and they may not want to pursue any criminal involvement? Is everybody comfortable with that concept?"

Later, a prospective juror asked about "press[ing] charges" in that situation. In response, the trial court explained: "[W]hat it means is would you be willing to testify, and in these types of circumstances, and it can be brother versus brother. I mean, . . . two brothers are fighting, the mother may not want to testify, the brother may not want to testify because it's a family dynamic that the People may call upon or the defense may call upon witnesses who may not feel comfortable

testifying, whether you're testifying for the prosecution or you're testifying for the defense."

Another prospective juror, Juror No. 22, stated that he grew up as a child in a family with domestic violence. It did not surprise him that someone could love his or her abuser. The trial court stated: "Okay. Is there anybody who cannot understand the concept that even if someone is abused[,] the victim of that situation can still love their abuser, and it can be across different ways, it can be child abuse, it can be domestic violence, it can be sexual abuse, the person who is alleged to have been the victim can still have feelings of love and loyalty for that person who abused them. Is there anybody who is not comfortable with that concept?"

During a break in voir dire, defense counsel objected to the court's remarks and moved for a mistrial. Counsel argued that the court had acted as a "domestic violence expert" when it made comments to the jury explaining that a domestic violence victim could love the abuser and not want to testify against him/her in court. Counsel stated she was concerned that the jury was likely to believe that the victim did not want to testify because she loved her abuser and did not want him prosecuted, instead of believing, for example, that the victim failed to testify out of fear that she would perjure herself if she continued to lie.

In response, the trial court stated that most of the comments were made by the jurors (Nos. 15 and 22), and the court had merely "fleshed . . . out" the comments. The court noted that its comments were not limited to domestic violence relationships, but also referenced child abuse and sexual assault. The court reasoned that it was common knowledge among lay persons that people may not want to testify against a loved one. Finally, the trial court stated that counsel could argue to the jury the reasons counsel thought that the victim, on prior

10

occasions, had decided not to testify. The trial court denied the motion for a mistrial. Prospective Jurors Nos. 15 and 22 ultimately were excused.

2. *Analysis*

Appellant contends a mistrial should have been declared, as the court's comments tainted the jury pool by "obliquely supporting Baquedano's eventual credibility." We disagree.

"'[J]udges . . . should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.'" (*People v. Burnett* (1993) 12 Cal.App.4th 469, 475, quoting *People v. Zammora* (1944) 66 Cal.App.2d 166, 210.) "A court commits misconduct if it creates the impression that it is denigrating the defense or otherwise allying itself with the prosecution." (*People v. Houston* (2012) 54 Cal.4th 1186, 1219.) Similarly, "it is judicial misconduct for a judge to display bias against the defense case or in favor of the prosecution during voir dire." (*People v. Fatone* (1985) 165 Cal.App.3d 1164, 1169.) "We determine the propriety of judicial comment on a case-by-case basis in light of its content and the circumstances in which it occurs." (*People v. Cash* (2002) 28 Cal.4th 703, 730.) "The role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'" (*People v. Harris* (2005) 37 Cal.4th 310, 347, quoting *People v. Snow* (2003) 30 Cal.4th 43, 78.)

Here, the trial court's comments were not so prejudicial as to deny appellant a fair trial. The comments elaborated on statements made by the prospective jurors. There was no discernible bias toward the defense or the prosecution. That a victim might still love an abuser and be uncomfortable testifying against the

abuser is commonly known and understood by lay persons. The court's remarks did not suggest that all victims -- or the victim in this case -- loved their abusers and were uncomfortable testifying because of those feelings. Nor did the remarks foreclose the possibility that an alleged victim might be uncomfortable testifying against an accused because she had lied about the incident and did not want to perjure herself. In short, we find no reversible error.

B. *Kiarah's Statements to Peace Officers*

Appellant next contends his convictions should be reversed, as he was denied his constitutional right to confront an adverse witness, viz., Kiarah, under the Sixth Amendment of the federal constitution. Appellant concedes that it was permissible for Detective Kim to testify that in response to his question about the location of the cord used against Baquedano, Kiarah indicated she knew where it was located, led the officers to the closet, and showed them the cord. However, appellant contends the subsequent testimony relating Kiarah's observations of the incident was testimonial hearsay inadmissible under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and its progeny.

As interpreted by the United States Supreme Court in *Crawford*, *supra*, 541 U.S. at page 59, the Sixth Amendment's Confrontation Clause prohibits testimonial hearsay unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine him or her. Although the court has not settled upon a definition of "'testimonial'" (see *People v. Holmes* (2012) 212 Cal.App.4th 431, 437), it has provided the following guidance:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially

relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822, fn. omitted.)

Thus, "statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*).) "[T]he primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*Ibid.*)

Applying these principles to the instant case, we conclude that Kiarah's statements about what she observed constituted testimonial hearsay. Kiarah was interviewed by the officers after appellant had been detained and placed in a patrol car and after her mother -- who had placed the 911 call -- had been interviewed. After Kiarah retrieved the cord and handed it to Detective Amis, she was asked why the cord was in the closet. By that time, there was no ongoing emergency. The officers were responding to a domestic violence call and had control of the situation, as appellant and the weapon (the cord) were in police custody. Moreover, having questioned Baquedano about what had happened and learned from Kiarah the location of the weapon, the primary purpose of further questioning of Kiarah was not to assist the officers in dealing with an ongoing emergency, but to establish past events potentially relevant to a later criminal prosecution.

The California Supreme Court's decision in *Cage* is instructive. There, the defendant had slashed her son's face with a shard of broken glass. At the hospital, he made two statements identifying his mother as his attacker -- one to a sheriff's deputy in the emergency room waiting room and another to the doctor treating his wound. (*Cage*, *supra*, 40 Cal.4th at pp. 971-972.) The court held that the

13

statement to the doctor was elicited for the purpose of properly treating him (an ongoing emergency) and was therefore nontestimonial. The statement to the deputy, however, was testimonial, because the deputy's interview was not intended to elicit testimony to facilitate medical treatment, but rather to obtain an account of past events involving the defendant. (*Id*. at p. 991.) The court also noted that there was no longer a contemporaneous emergency that required law enforcement, as the victim had been safely separated from his attacker and was in no further danger from her. (*Ibid*.) It rejected the characterization of the deputy's interview as an effort to assess the situation to "determine whether further immediate police action might be necessary to apprehend the perpetrator, to ensure the safety of the apprehending officers, and to safeguard the other minors in defendant's home." (*Id*. at p. 985, fn. 15.) Here, as in *Cage*, there was no longer a contemporaneous emergency requiring police intervention: appellant had been separated from Baquedano and the weapon had been seized. As the police had the suspect and weapon in custody, Detective Kim's further questioning cannot be characterized as an attempt to assess the situation.

*People v. Gann* (2011) 193 Cal.App.4th 994, relied upon by the People, is distinguishable. There, a brother and sister plotted to kill their stepfather, but make it appear to be a home invasion robbery. After the staged robbery and the murder of the stepfather, the brother fled the crime scene. In a joint trial with separate juries, the brother's jury was permitted to hear statements made by his sister. While sitting in an ambulance at the scene, the sister told the police that a masked man surprised her stepfather in the house, bound his hands, demanded the combination to the safe, engaged in a struggle with the stepfather, and shot the stepfather. (*Id*. at pp. 999-1002.) The brother claimed his sister's statements to the police were inadmissible as testimonial hearsay. The appellate court rejected this

14

claim, finding the sister's statements nontestimonial, as the police were primarily concerned with determining what had happened and whether the sister had any information that could help them find the suspect. (*Id*. at pp. 1007-1009.) In contrast, here, the officers already had Baquedano's statements about what had happened, and the police already had apprehended the suspect and secured the weapon. Questioning Kiarah about what had happened between appellant and her mother was not necessary for the officers to deal with an ongoing emergency. In short, Kiarah's statements describing the incident were inadmissible testimonial hearsay.

We conclude, however, that the admission of the statements was harmless beyond a reasonable doubt. (*Cage*, *supra*, 40 Cal.4th at pp. 991-992 [evidentiary error under *Crawford* subject to harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24].) Kiarah's statements were consistent with Baquedano's. While they tended to corroborate Baquedano's version of events, other physical evidence did so far more forcefully, rendering the statements cumulative. The jury heard the recording of Baquedano's 911 call, saw the photos depicting her visible injuries -- including ligature marks and bruising -- and heard the testimony of the hospital nurse, Reina, that Baquedano's injuries were consistent with attempted strangulation. Any probative effect of Kiarah's statements was further blunted by the fact that she did not claim to have seen appellant choke Baquedano.

Appellant contends the testimony was calculated to prejudice the jury, as Detective Kim "carefully described a little girl who was frightened, emotional, scared, shaking, [and] crying." However, there was nothing impermissible about that testimony; a detective may testify to his observation of a victim's or witness's demeanor. Similarly, as appellant himself concedes, Detective Kim's testimony

15

that when asked about the cord, Kiarah led officers to the closet, retrieved it and handed it to them was admissible. Under these circumstances, omission of Kiarah's statements about the incident would not have altered the outcome of the trial. In sum, even under the stringent standard applicable here, we conclude that admission of Kiarah's statements, though error, was harmless beyond a reasonable doubt.

C.    *Sufficiency of the Evidence on the Vandalism Conviction*

Appellant contends there was insufficient evidence of his intent to maliciously damage the window of the patrol vehicle. "In determining whether the evidence is sufficient to support a conviction or an enhancement, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.) Intent is "rarely susceptible of direct proof and must therefore be proven circumstantially." (*People v. Thomas* (2011) 52 Cal.4th 336, 355.) Malicious intent may be inferred from the "commission of any wrongful act that caused damage." (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1282, italics omitted.) For example, in the case of arson, "malice will be presumed or implied from the deliberate and intentional ignition or act of setting a fire without a legal justification, excuse, or claim of right." (*In re V.V.* (2011) 51 Cal.4th 1020, 1028.) Here, appellant repeatedly banged his head against the window of the patrol car without any legal justification, excuse, or claim of right. A reasonable jury could infer from appellant's conduct that he acted with malicious intent. In short, there was sufficient evidence to support appellant's conviction for vandalism.

16

D. *Criminal Protective Order*

1. *Relevant Proceedings*

At sentencing, the trial court issued a criminal protective order as to Baquedano, Kiarah, and Jeffrey for the duration of 10 years. Among other provisions, appellant was ordered not to contact the protected parties, except through defense counsel.

After the appellate record was filed, counsel filed a written ex parte motion with the trial court to correct the criminal protective order. At the hearing on the motion, appellant argued that the court was not authorized under either section 136.2 or section 273.5 to issue the protective order as to Kiarah and Jeffrey because they were not domestic violence victims. The court indicated that its tentative ruling was to allow Kiarah and Jeffrey to remain on the protective order pursuant to section 136.2, subdivision (a)(6). The court found that as to Kiarah, although she was not a direct victim of domestic violence, she was a "collateral" victim because she witnessed the incident. Additionally, as an "immediate family member[]," the court believed she qualified under section 136.2, subdivision (a)(6). As to Jeffrey, the court ruled that it might be inclined to lift the protective order as to him if appellant obtained a family court order allowing him contact with Jeffrey. The court denied the motion, but ordered that the protective order be modified to include a reference to section 136.2.

2. *Analysis*

The parties agree that the court lacked authority to issue a protective order as to Kiarah and Jeffrey under section 136.2, subdivision (a)(6), as that statutory provision does not authorize postconviction protective orders. (See *People v. Selga* (2008) 162 Cal.App.4th 113, 118-119.) The People argue, however, that the court had authority to issue the protective order under section 136.2, subdivision

17

(i)(1) or section 273.5, subdivision (j). Appellant disagrees, arguing that those statutory provisions apply only to "victims," and Kiarah and Jeffrey were not victims of the charged offenses.

"Issues of statutory interpretation are questions of law subject to our independent or de novo review. [Citations.] 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citatons.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." [Citations.] Thus, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.] Finally, we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness."' [Citation.]" (*Babalola v. Superior Court* (2011) 192 Cal.App.4th 948, 956 [interpreting section 136.2].)

a.    *Protective Order under Section 136.2, Subdivision (i)(1)*

Section 136.2, subdivision (i)(1) provides in pertinent part:

> "In all cases in which a criminal defendant has been convicted of a crime of domestic violence . . . , the court, at the time of sentencing, shall consider issuing an order restraining the defendant from any contact with the victim. The order may be valid for up to 10 years, as determined by the court. . . . It is the intent of the Legislature in enacting this subdivision that the duration of any restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."

As used in the chapter containing section 136.2, subdivision (i)(1), "'[v]ictim' means any natural person with respect to whom there is reason to believe that any

18

crime as defined under the laws of this state . . . is being or has been perpetrated or attempted to be perpetrated." (§ 136.)

Under the plain language of section 136.2, subdivision (i)(1), a postconviction protective order is limited to restraining the defendant from contact with a "victim," that is, a "natural person with respect to whom there is reason to believe that any crime . . . is being or has been perpetrated or attempted to be perpetrated." Appellant was convicted of assaulting Baquedano. On the record before the trial court, there was no reason to believe that any crime was being or had been perpetrated or attempted to be perpetrated against Jeffrey or Kiarah. Baquedano testified that appellant "never touched" the children, and no evidence suggests that appellant ever attempted to harm them. Baquedano thought the children were in another room at the time of the incident, and she never saw Kiarah in the bedroom. Thus, section 136.2, subdivision (i)(1) does not provide statutory authorization for the issuance of a protective order forbidding appellant any contact with Jeffrey or Kiarah.

Relying on *People v. Clayburg* (2012) 211 Cal.App.4th 86 (*Clayburg*), the People contend that Jeffrey and Kiarah were "victims," as they were members of Baquedano's immediate family and were harmed by appellant's actions. The People's reliance on *Clayburg* is misplaced for several reasons. First, *Clayburg* involved a different statute, section 646.9, subdivision (k), although the language in that statute is substantially similar to the language in section 136.2, subdivision (i)(1).

More important, we must disagree with the *Clayburg* majority's interpretation of the language in section 646.9, subdivision (k). That statute provides: "'The . . . court . . . shall consider issuing an order restraining the defendant from any contact with the victim, that may be valid for up to 10 years, as

19

determined by the court.  [(First sentence.)]  It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family.  [(Second sentence.)]'"  (*Clayburg*, *supra*, 211 Cal.App.4th at pp. 88-89.)  The *Clayburg* majority held that the second sentence modified the first sentence, and expanded the meaning of "victim" in the first sentence to include "a member of the immediate family of the stalking victim . . . who suffers emotional harm."  (*Id*. at p. 88.)  We read the second sentence to mean what it says:  the court should consider, among other factors, the "safety of the victim and his or her immediate family" in determining the length of the restraining order authorized in the first sentence.  Nothing suggests the second sentence also modifies the scope of the restraining order.  As noted by Justice Perren in the *Clayburg* dissent, if the term "victim" in the first sentence included a child of the family, the second sentence would have no need to refer to "the victim and his or her immediate family."  (*Id*. at pp. 94-95 (dis. opn. of Perren, J.).)

For similar reasons, we conclude in the instant case that the statutory language in section 136.2, subdivision (i)(1) providing that "the duration of any restraining order issued by the court be based upon . . . the safety of the victim and his or her immediate family" does not modify the term "victim" in the first sentence.  Thus, any restraining order issued under this provision must be limited to prohibiting contact with the victim.

Finally, *Clayburg* is factually distinguishable.  There, the evidence established that the defendant stalked the named victim and the victim's child, causing both to suffer emotional harm.  On those facts, a protective order could have been issued covering the child under section 136.2, subdivision (i)(1), as the child was a "natural person with respect to whom there is reason to believe that any

20

crime as defined under the laws of this state . . . is being or has been perpetrated or attempted to be perpetrated." (§ 136.)  In contrast, here, no evidence suggests Jeffery and Kiarah were similarly targeted or harmed.

In sum, absent evidence from which the trial court could reasonably conclude that appellant had harmed or attempted to harm Jeffrey or Kiarah, the court lacked authority to issue the no-contact protective order as  to the children under section 136.2, subdivision (i)(1).

        b.     *Protective Order under Section 273.5, Subdivision (j)*

Section 273.5, subdivision (j) contains language similar to section 136.2, subdivision (i)(1).  It provides:  "Upon conviction under subdivision (a) [for willful infliction of a corporal injury upon a victim], the sentencing court shall also consider issuing an order restraining the defendant from any contact with the victim, which may be valid for up to 10 years, as determined by the court.  It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of the victim and his or her immediate family."  (§ 273.5, subd. (j).) Section 273.5, subdivision (b) provides that subdivision (a) applies if the victim is or was one or more of the following:  (1) the offender's spouse or former spouse, (2) the offender's cohabitant or former cohabitant, (3) the offender's fiancée, or (4) the mother or father of the offender's child.  (§ 273.5, subd. (b).)

Under the plain language of section 273.5, the court lacked authority to issue a protective order as to Jeffrey and Kiarah.  First, Jeffrey and Kiarah are not victims under section 273.5, subdivision (j).  Baquedano confirmed that appellant never used physical force against them (see *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477 [a violation of section 273.5 occurs only where a direct application of force on the victim results in corporal injury]).  Second, for

21

the reasons stated above, the second sentence of subsection 273.5, subdivision (j) -- addressing the length of the restraining order -- does not modify the term "victim" in the first sentence or expand it to include the children. Our interpretation is bolstered by the fact that the children do not fall within one or more of the categories of victims listed in section 273.5, subdivision (b). That statutory section limits the applicability of section 273.5, subdivision (a) to certain victims (spouses, cohabitants, fiancées, and parent of the offender's child), and correspondingly limits the scope of the restraining order authorized by section 273.5, subdivision (j). Thus, section 273.5, subdivision (j) does not authorize the court to issue a protective order as to Jeffrey and Kiarah.

In short, neither section 136.2, subdivision (i)(1), nor section 273.5, subdivision (j) provides legal authority for the issuance of a protective order forbidding appellant from any contact with Jeffrey or Kiarah. Accordingly, the protective order must be modified to remove their names.

E.     *Presentence Custody Credits*

Finally, the People argue that the abstract of judgment does not reflect appellant's correct presentence custody credits, as appellant was entitled to only 266 days of actual custody credit and 266 days of conduct credit (instead of 326 days each). The People request this court exercise its inherent authority to correct the clerical error. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Appellant provided no response to the People's argument. After reviewing the record, we conclude the People are correct. Accordingly, we will remand with directions to modify the abstract of judgment to reflect 532 days of presentence custody credit, consisting of 266 days of actual custody and 266 days of conduct credit.

22

## DISPOSITION

The convictions are affirmed, and the matter is remanded with directions to the superior court to modify the abstract of judgment to correct the amount of presentence custody credits, and to modify the protective order to remove Jeffrey and Kiarah.  As modified, the judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION.**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

23