[No. B057339. Second Dist., Div. Seven. Jan. 12, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES BURNETT et al., Defendants and Appellants.

## Counsel

Thomas T. Ono and Barbara Springer Perry, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Keith H. Borjon and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WOODS (Fred), J.**—A jury convicted Charles Burnett and Herbert Shedd (appellants) of first degree murder (Pen. Code,[1] § 187) and the trial court sentenced each of them to a 25-years-to-life state prison term. They contend the judgment must be reversed because the trial court: (1) made disparaging comments about defense counsel, (2) prematurely determined prosecution witnesses were not accomplices, (3) failed to admonish a misbehaving juror, (4) unduly restricted defense cross-examination, (5) failed to instruct on voluntary manslaughter, (6) failed to give an identity instruction (CALJIC No. 2.91), and (7) gave an erroneous torture instruction (CALJIC No. 8.26). We find no error and affirm the judgment.

### Procedural and Factual Background

On August 7, 1989, the District Attorney of Los Angeles County filed an information alleging Charles Burnett and Herbert Shedd murdered Kellie Beasley on November 16, 1988. Appellants pleaded not guilty. A jury trial began March 7, 1990. On June 14, 1990, the jury being hopelessly deadlocked, a mistrial was declared.

On November 13, 1990, a second jury trial began. On December 28, 1990, the jury found each appellant guilty of first degree murder. Each was sentenced to state prison for a 25 years to life term.

There being no insufficiency of evidence claim, we synopsize the evidence and do so with a perspective favoring the judgment. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110].)

On November 17, 1988, a female body was discovered in Griffith Park. It was about 35 feet down a hill, wrapped in a blanket cinched by a belt, and

---

[1]Unless otherwise noted, all statutory references are to the Penal Code.

enclosed inside plastic trash bags. The body was hog-tied: hands tied behind back, legs tied and linked to hands. There was a gag in the victim's mouth with a cloth wrapped around her mouth. An electric cord was tied around her neck and connected to her hand and feet ligatures. Other belts and cords further secured the body. There was no identification.

Six weeks later, on January 4, 1989, police identified the body as 26-year-old Kellie Beasley. She had been staying at an apartment in Hollywood at 5225 Lexington Avenue and on January 4th the police went there. They found a butcher knife and trash bags similar to those encasing the victim's body.

On January 6, 1989, the police arrested the renter of the Lexington apartment, Larry "Pete" Turner. He gave them a statement.

On January 9, 1989, the police arrested Charles Burnett (Burnett) and later, Herbert Shedd (Shedd). Other occupants of the Lexington apartment, some intermittent, were identified and arrested: Trinetta "Gee Gee" Jimeniz (Gee Gee), Joan Pamela Ray (Pam), Julie Cooper (Julie), and Keith Johnson (Keith). All testified.

Burnett was a cocaine dealer but did not use cocaine. All the others did. Pam, Julie, and the victim, Kellie Beasley also sold cocaine for Burnett. Shedd worked for Burnett and did his "dirty work." Only Pete Turner had a "regular" job, shop foreman at Lorimar Telepictures.

On several occasions prior to November 16, 1988, Kellie was given cocaine to sell but returned to the Lexington apartment without money or cocaine. Burnett and Shedd beat and threatened her. A few days before November 16th Burnett hog-tied her and put her under the dining room table.

On November 15th, in the evening, Burnett again gave Kellie cocaine to sell. She left the apartment, returned November 16th, again without money or cocaine, and went to sleep in the bedroom. Burnett and Shedd struck her, asked where the money or cocaine was, tied her up, carried her to the bathroom, and put her into the tub with about one inch of water. Gee Gee, Pam, Julie, and Keith were in the living room. Although the radio volume had been turned up, they could hear beating sounds from the bathroom for about 30 minutes. When Burnett and Shedd came into the living room they indicated Kellie was dead.

Burnett and Shedd carried Kellie's bound and wrapped body to Keith's car and Keith drove to Griffith Park where the body was dumped.

DISCUSSION

1. ▮▮▮ *Appellants contend the trial court's antagonistic and disparaging comments deprived them of due process and a fair trial.*

There is no dispute about how a trial judge should act. ▮▮ "[J]udges presiding at trials should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other." (*People* v. *Zammora* (1944) 66 Cal.App.2d 166, 210 [152 P.2d 180].) " 'The [trial] judge has a duty to be impartial, courteous and patient . . . and its violation may be so serious as to constitute reversible error.' " (*People* v. *Harmon* (1992) 7 Cal.App.4th 845, 852 [9 Cal.Rptr.2d 265].) "It is completely improper for a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial . . . . When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client." (*People* v. *Fatone* (1985) 165 Cal.App.3d 1164, 1174-1175 [211 Cal.Rptr. 288].)

Socrates succinctly counselled: "Four things belong to a judge: to hear courteously, to answer wisely, to consider soberly, and to decide impartially." (*People* v. *Hefner* (1981) 127 Cal.App.3d 88, 92 [179 Cal.Rptr. 336], internal quotation marks omitted.)

Nor is there disagreement concerning a judge's trial responsibilities and powers: "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) These duties and powers are not only statutory but inherent. (*People* v. *Miller* (1960) 185 Cal.App.2d 59, 77 [8 Cal.Rptr. 91]; *People* v. *Melton* (1988) 44 Cal.3d 713, 734 [244 Cal.Rptr. 867, 750 P.2d 741].)

▮▮▮ Appellants contend the trial court, in seeking to control the trial proceedings, breached its duties of courtesy and impartiality, thus depriving them of due process and a fair trial. To support their claim they cite 34 examples of judicial misconduct or intemperance. We have considered each.

Nine of the instances were outside the presence of the jury and could not have prejudiced appellants. On six occasions, three outside the presence of the jury, the trial court's comments resulted in a ruling favorable to appellants or were designed to protect the interests of appellants. But most importantly, on all 34 occasions appellants failed to either object or request a curative admonition. Their objection now comes too late (Evid. Code,

§ 353; *People* v. *Melton, supra,* 44 Cal.3d 713, 753 [judge made jesting comments]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908] [judge's comments during voir dire], reversed on other grounds, *California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446]; *People* v. *Green* (1980) 27 Cal.3d 1, 28 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Harmon, supra,* 7 Cal.App.4th 845, 852 [judge had back turned to defense attorney during her final argument]; *People* v. *Franklin* (1976) 56 Cal.App.3d 18, 24 [128 Cal.Rptr. 94] [judge turned his back to defense expert witness]; *People* v. *Miller, supra,* 185 Cal.App.2d 59, 78.)

We add this observation. Although there were instances of judicial exasperation and unfiltered candor, the trial was protracted (1876 pages of reporter's transcript) and the provocation substantial. Defense counsel often asked improper questions and flouted the court's rulings. (E.g., after a hearsay objection was sustained Burnett's trial counsel twice repeated the question.) Occasionally, in asking questions, defense counsel gave testimony. The prosecutor made frequent improper and disruptive objections. Much time was consumed on, at best, collateral matter. Questioning by counsel was imprecise, repetitious, and often obfuscating. Through it all the trial court was protective of appellants' rights, personally securing the attendance of a defense witness (Dr. Swalwell) on short notice and granting Burnett an in-trial continuance to lay the foundation for a defense document. We are satisfied appellants were afforded a fair trial.

2. ▮▮▮ *Appellant Shedd contends "the trial court committed prejudicial misconduct and invaded the province of the jury when it prematurely and erroneously determined that the prosecution witnesses were not accomplices, as a matter of law, and so advised the jury."*

Appellant Shedd devotes 11 pages of his brief to argue trial court error regarding the accomplice status of prosecution witnesses. But appellant Shedd finds no fault with the accomplice instructions the court gave (CALJIC Nos. 3.10, 3.11 (1990 rev.), 3.12, 3.13, 3.14, 3.18, and 3.19) and does not suggest others should have been given.

Rather he complains about two of the court's comments. One ("Jury is not to infer from that that she [Gee Gee Jimeniz] is subject to being charged with this crime.") was not objected to and error, if any, was waived. (Evid. Code, § 353; *People* v. *Green, supra,* 27 Cal.3d 1, 28.)

The other was objected to. An extended colloquy culminated in a defense request for a clarifying admonition. The trial court granted the request and explained to the jury that attorney questions were not evidence but if there

was evidence prosecution witnesses were accomplices, then the jury could so determine. Trial counsel for appellant Shedd thanked the trial court, appeared satisfied with the admonition, and did not request any further admonition.

Appellant Shedd's contention is without merit.

3. ██ *Appellant Shedd contends "the court committed prejudicial error when it failed to admonish a juror who was behaving inappropriately or inquire whether other jurors had been influenced by the conduct."*

This contention is based upon two incidents. The first occurred during a recess when Shedd's trial counsel told the court that "a couple of days ago [he] noticed that one of the jurors was laughing at inopportune times, at times I would question a witness." He said the juror had laughed again today during his questioning of a prosecution criminalist. Counsel also stated that when this juror had been coughing the prosecutor gave him a glass of water. Counsel's only request was for the trial court to "Just watch in the future for him."

Counsel did *not* request the juror be questioned, admonished, or excused or that any other ameliorative action be taken.

No one else stated they had observed the complained of juror behavior.

The second incident occurred at a side bar conference, when an unrelated matter was being discussed. Shedd's trial counsel again made a belated complaint about this juror, stating that earlier (at least 20 reporter's transcript pages earlier), while he was cross-examining a prosecution witness he heard a "lot of words and sighs and laughter coming from this juror." (No one else stated they had observed this claimed conduct.) Counsel did not request that the juror be questioned or admonished but did move that he be excused. The court denied the motion but stated he would admonish the jury. At the next recess the court did so.[2]

Apparently the admonition was effective because there was no further complaint.

We find no trial court error.

---

[2]The court stated: "Before the jury leaves, I hear some muttering of some sounds coming from the jury, and I'd ask, please, that you refrain from any kind of utterances, from any sounds of any sort until you get back in the jury room . . . but up until then, please try to control yourselves."

4. ■ *Appellants contend the trial court erred in denying their request for voluntary manslaughter instructions.*

Appellants claim they were entitled to voluntary manslaughter instructions based upon evidence of heat of passion. But the evidence they rely upon showed anger and a desire for revenge. Heat of passion may not be based upon revenge. (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1112 [755 P.2d 960].) Moreover, the heat of passion doctrine, comprehensive though it may be, does not include drug dealers put out of sorts by the vicissitudes of their trade.

The trial court properly refused voluntary manslaughter instructions.

5. ■ *Appellants contend the trial court erred in refusing to give an eyewitness identification instruction. (CALJIC No. 2.91.[3])*

Appellants argue "[i]t is uncontroverted that this was a[n] eyewitness identification case" because . . . "[t]here is absolutely no physical evidence linking appellant[s] to the charged homicide." They are mistaken.

Assuming appellants did request the subject instruction,[4] it was properly refused. Although witness credibility was in issue, eyewitness identification was not. All the eyewitnesses knew appellants and each other, the murder was protracted and took place in a small apartment during the day, and there was no claim of mistaken identification.

Trial courts have a duty not only to give appropriate instructions but not to give inappropriate ones. If "brevity is the soul of wit" loquacity is the bane of comprehension.

There was no error.

6. ■ *Appellants contend the trial court erred in its murder by torture instruction. (CALJIC No. 8.24 (1989 rev.).[5])*

Appellants contend the subject instruction "fails to instruct the jury that it must find the torturous acts to have been committed while the victim was

---

[3]The instruction reads: "The burden is on the People to prove beyond a reasonable doubt that the defendant is the person who committed the crime with which he is charged.

"If, after considering the circumstances of the identification and any other evidence in this case, you have a reasonable doubt whether defendant was the person who committed the crime, you must give the defendant the benefit of that doubt and find him not guilty."

[4]It is *not* clear appellants made such a request. The instruction is not in the clerk's transcript among rejected instructions, and the brief discussion between the trial court and counsel concerning CALJIC No. 2.91 is, at best, ambiguous.

[5]The instruction reads: "Murder which is perpetrated by torture is murder of the first degree.

alive. Since a dead person cannot feel pain, torture cannot occur without a living victim." Appellants argue that since the instruction only states the perpetrator must *intend* to torture "a living human being," the human being, when "tortured," may not have been alive.

This argument has been considered and rejected by *People* v. *St. Joseph* (1990) 226 Cal.App.3d 289, 296-297 [276 Cal.Rptr. 498] (see also *People* v. *Mincey* (1992) 2 Cal.4th 408, 436 [6 Cal.Rptr.2d 822, 827 P.2d 388]), a case with which we agree.

There was no error.

7. ■ *Appellants contend the trial court erred in restricting their cross-examination of Pete Turner.*

Pete Turner testified that on November 16, 1988, he was not in his apartment and had no personal knowledge of what then occurred there. Appellants sought to impeach him and prove he was present and thus might have been an accomplice. They relied upon a January 6, 1989, statement Turner made to the police in which he described having seen the victim hog-tied and beaten. The statement did not specify the date of the incident and Turner testified it was several days before the November 16 murder.

Appellants sought to ask Turner if, when the police interviewed him, they threatened him with the gas chamber. The trial court prohibited the question and appellants claim error.

We find the error, if any, harmless for the following reasons: (1) Turner admitted the police arrested him for murder and that he gave them a statement because he "was scared and frightened of bodily harm"; (2) all the prosecution witnesses testified Turner was not present during the November 16 murder; (3) Turner, without contradiction, testified he worked all day on

---

"The essential elements of murder by torture are:

"1.   One person murdered another person, and

"2.   The perpetrator committed the murder with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose.

"3.   The acts or actions taken by the perpetrator to inflict extreme and prolonged pain were a proximate cause of the victim's death.

"The crime of murder by torture does not require any proof that the perpetrator intended to kill his victim, or any proof that the victim was aware of pain or suffering.

"The word 'willful' as used in this instruction means intentional.

"The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.

"The word 'premeditated' means considered beforehand."

November 16; (4) appellants fully and repeatedly cross-examined Turner (116 reporter's transcript pages of cross-examination); and (5) whatever pressure the police exerted on Turner was intended to make Turner say he was *present*, not absent, during the murder.

## DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Johnson, J., concurred in the judgment only.

A petition for a rehearing was denied February 2, 1993, and appellants' petition for review by the Supreme Court was denied April 14, 1993.