Filed 9/22/22  P. v. Smith CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B308972 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA142223) |
| v. | |
| JOSHUA TYRECE SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Shannon Chase, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Colleen M. Tiedemann and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Joshua Tyrece Smith of one count of first degree murder and found true principal firearm use and gang allegations. On appeal, Smith claims the trial court erred when it did not instruct the jury, sua sponte, on voluntary manslaughter under a heat of passion theory, and that he was deprived of his constitutional right to the effective assistance of counsel. We reject those contentions. However, Smith is entitled to the benefit of recently enacted sentencing legislation relating to gang allegations. We therefore remand for further proceedings.

## FACTUAL BACKGROUND

Around 4:00 a.m. on October 29, 2016, Hoover Criminals street gang member Deondre Hamilton was shot and killed in South Los Angeles. An informant told police there had previously been an altercation involving Hamilton and one of his associates, with members of the Broadway Crips gang. The incident ended with Hamilton's associate brandishing a gun at the Broadway Crips gang members. The Broadway Crips gang territory included 111th Street and Broadway. The informant also told police that a person involved in the altercation lived near 111th and Broadway.

Around 8:00 a.m. on October 29, Smith's brother, Aukeem,[1] drove by the Hamilton crime scene, then on to his and Smith's mother's house. Smith often stayed at their mother's house, and his white Suzuki was there that day. Smith told Aukeem "one of

---

[1] We refer to Smith's brother as Aukeem for ease of reference, intending no disrespect. Aukeem testified at the trial; some of his recorded statements from a prior police interview were also admitted.

[Smith's] homies" had been killed. Eventually, Smith and 15 to 20 other Hoover gang members were assembled at the house.[2] The group discussed Hamilton's death, but no one knew the perpetrator or what had led to the shooting. Smith was not "upset" but "probably . . . kind of hurt." Aukeem was quite sure that retaliation was discussed, because this was "how they operate." Aukeem told police and testified that he left his mother's house about 20 minutes after arriving, and that Smith was still there when he left. However, Aukeem also told police he saw Smith and other Hoover gang members get into Smith's white Suzuki.

At approximately 9:30 a.m. on October 29, 22-year-old Marquise Thomas left his house and headed to a nearby bus stop at 111th and Broadway. Thomas was not a gang member. Around 9:40 a.m., Thomas was shot three times from behind. An eyewitness in a parked car at 111th and Broadway called 911 after hearing gunshots. The eyewitness saw a dark-skinned individual in a hoodie run toward a white crossover vehicle and enter its front passenger side. The vehicle drove in reverse until it reached Olive Street and then drove away. Thomas suffered multiple gunshot wounds. He died from his injuries.

The police obtained surveillance footage depicting a white Suzuki Grand Vitara bearing paper dealer plates driving near Thomas before the shooting. Detectives learned that on

---

[2] At trial, Aukeem denied that he and Smith were in the Hoover gang, but he previously acknowledged to police that Smith was a member of 9-Deuce, a subsection of the Hoover Criminals gang. Aukeem also claimed he did not know Hamilton and never saw Smith with him.

October 22, 2016, an auto dealership sold a white Suzuki Grand Vitara to Smith, who was a frequent customer.

Cars sold on payment plans, such as Smith's, contained GPS trackers. Data obtained from the tracking device reflected that, on October 29, Smith's Suzuki was parked near his home at 8:51 a.m., was at a known Hoover gang location at 9:10 a.m., and then was near Smith's home again at 9:48 a.m. 111th and Broadway was an approximate 10-minute drive from Smith's home. Location data for Smith's cellphone, accurate down to several meters, reflected that, around 9:39 a.m. on October 29, the phone was moving toward Broadway and 107th Street. At 9:41 a.m., the phone was moving toward Olive Street.

On November 1, Smith sought to exchange the Suzuki, but the dealer wanted him to make a payment first. That same day, Smith posted on social media about how emotional he was about Hamilton's death, referring to him as "one of [his] close goons."

On November 3, an employee at a shoe store in Inglewood observed an unusual interaction between a group of men, including Smith, and a group of women, including Thomas's two sisters and mother. Thomas's sisters recognized some of the men from social media comments they had read about Hamilton's death. Some of the women were wearing sweatshirts memorializing Thomas, and one of the men was observed staring at a picture of Thomas on one of the sweatshirts. The men left in a small white SUV. The name of the dealership where Smith had purchased the Grand Vitara was written across the SUV's front paper license plates. One of the sisters photographed the car. About two weeks later, Smith made a payment to the dealership and exchanged the Suzuki.

4

In January 2017, Smith was arrested and interviewed. Smith claimed he was no longer an active Hoover gang member. Though Smith knew Hamilton and attended his funeral because he was a Hoover, Smith denied interacting with Hoover gang members at the funeral. He also denied knowing Thomas, and claimed he was at home at the time of the shooting. Smith at first said he owned only a Mustang, but after being confronted with evidence of his car purchase and the photos from the shoe store, he acknowledged that police may have seen his friend's Suzuki because he had "the same exact car." Smith denied that the phone number and social media accounts that police had associated with him were his. After Smith was booked for murder, he offered to identify Thomas's shooter, but insisted he was not present at the shooting.

At trial, Los Angeles Police Officer Andrew Jenkins testified as a gang expert familiar with the Hoover Criminals street gang. Jenkins provided background regarding the Hoover gang's primary activities, territory and rivalries, membership, use of symbols and monikers, and predicate crimes. Jenkins testified that it is important for gangs to retaliate against rival gangs to garner respect, and to signal that the gang will not be victimized. When a gang retaliates, they enter the other gang's territory and strike back at anyone who appears to be a rival.

Based on Jenkins's review of field identification cards, several of Smith's tattoos, his recorded admissions or statements, and his moniker, Jenkins believed Smith was a member of the Hoover Criminals street gang. When given a hypothetical question based upon the evidence, Jenkins opined that the shooting was committed to benefit the Hoover street gang. The driver was necessarily a full member of the gang. Jenkins

5

testified that Hamilton had also been a member of the Hoover gang.

The jury convicted Smith of first degree murder (Pen. Code, § 187, subd. (a); count 1),[3] and found true principal firearm use allegations (§ 12022.53, subds. (d), (e)(1)) and gang allegations (§ 186.22, subd. (b)(1)(c)).[4] The court imposed a 25-years-to-life sentence for the firearm enhancement, consecutive to a 25-years-to-life sentence on the murder conviction.

## DISCUSSION

I. **The trial court did not err in failing to instruct, sua sponte, on voluntary manslaughter**

Smith asserts the trial court erred in failing to instruct the jury sua sponte on voluntary manslaughter under a heat of passion theory. Smith argues there was substantial evidence to support a finding that he killed Thomas in a heat of passion due to sufficient and continuing provocation. We find no error.

---

[3] All further undesignated statutory references are to the Penal Code.

[4] The gun use enhancements under section 12022.53, subdivision (e)(1), apply to any principal in the commission of an offense if "(A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

## A.    *Governing legal principles*

It is the trial court's " ' " 'duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.' " ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 718, italics omitted.) " ' "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.' " ' " (*People v. Souza* (2012) 54 Cal.4th 90, 116.)  In this context, the " 'substantial evidence requirement is not satisfied by " 'any evidence . . . no matter how weak,' " but rather by evidence from which a jury . . . could conclude "that the lesser offense, but not the greater, was committed." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538, italics omitted.)  " 'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' " (*Ibid.*)

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.'  (§ 187, subd. (a).)  'Manslaughter is the unlawful killing of a human being without malice.' (§ 192, subd. (a).)  Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter.  Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*People v. Nelson, supra*, 1 Cal.5th at p. 538.)

"Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and

7

reflection, and from such passion rather than from judgment." ' " (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) This theory has both an objective and a subjective component. To satisfy the objective component, " ' "the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the subjective component, "the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Id.* at p. 550.) The " ' "factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." ' [Citation.] 'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649, italics omitted.) However, "[h]eat of passion may not be based upon revenge." (*People v. Burnett* (1993) 12 Cal.App.4th 469, 478.)

**B.     *The trial court did not err in failing to instruct the jury on heat of passion***

Substantial evidence did not support a heat of passion instruction, and we therefore find no error.

A legally adequate provocation generally requires that "the deceased must be the source of the defendant's rage or passion." (*People v. Spurlin* (1984) 156 Cal.App.3d 119, 126.) Here, there was no evidence that Thomas was involved in the shooting of Smith's fellow gang member or in any other provocation. Smith argues that because Thomas was walking near 111th and Broadway when he was shot, a juror could reasonably find that

8

Smith believed Thomas was responsible for Hamilton's death. Yet, there was no evidence that Smith harbored that belief.[5]

" '[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable [person].' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253.) Indeed, the applicable objective standard requires us to measure the defendant's actions against those of an "ordinary reasonable person," not an "ordinary reasonable gang member." (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 176.) The evidence at trial was that neither Smith nor the other gang members assembled on October 29 knew who shot Hamilton. Smith denied knowing Thomas. A gang member who indiscriminately targets individuals, merely because they are in the proximity of a recent shooting of a fellow gang member, does not satisfy the objective component of the heat of passion theory.

Moreover, there was no evidence that Smith acted while under the influence of a passion so strong that judgment could not and did not intervene. (*People v. Beck and Cruz, supra,* 8 Cal.5th at p. 649.) To the contrary, Smith's brother, who was with Smith immediately before Thomas's murder, attested that

---

[5] Smith suggests that an instruction was warranted because the prosecutor advanced a version of this argument in her closing remarks. However, statements made in closing argument are not evidence. (§ 1093, subd. (e).) Moreover, the prosecutor's argument was that Smith was motivated by revenge, which, as noted above, does not support a heat of passion instruction. (*People v. Burnett, supra,* 12 Cal.App.4th at p. 478.)

Smith was not upset, but only "kind of hurt," about Hamilton's death.  The emotional social media tributes that Smith posted about Hamilton occurred days after the shootings, after opportunity to reflect.  Those posts are therefore not probative of—much less "substantial evidence" of—Smith's state of mind when Thomas was shot.  (*People v. Souza, supra*, 54 Cal.4th at p. 116.)

Smith's reliance on *People v. Brooks* (1986) 185 Cal.App.3d 687 (*Brooks*), is misplaced.  In *Brooks*, the defendant's brother was murdered.  Shortly after, the defendant "in a very excited, upset state, was running around talking to people, and trying to find out who killed his brother."  (*Id.* at p. 691.)  Hours later, at the same location of the murder, the defendant learned the assailant's identity and confronted him, yelling, " 'Where is your knife?' "  The defendant then shot the assailant five times.  (*Id.* at p. 690.)  The court concluded there was substantial evidence warranting a provocation and heat of passion instruction, reasoning that provocation that incites a defendant's actions must "be conduct reasonably believed by the defendant to have been engaged in by the victim."  (*People v. Lee* (1999) 20 Cal.4th 47, 59; *Brooks*, *supra*, at p. 694 ["the disclosure of information that the victim murdered a family member of the defendant is legally adequate provocation for voluntary manslaughter"].)  In contrast, here there was no evidence that Thomas had anything to do with Hamilton's shooting, or that Smith reasonably believed Thomas was involved in Hamilton's shooting.  The close nexus between the provocative act and the actions alleged to have occurred in the heat of passion in *Brooks* is entirely absent here.

There was no substantial evidence of provocation or heat of passion with respect to Thomas's killing. The trial court had no sua sponte obligation to instruct on voluntary manslaughter.

## II.    **There was no ineffective assistance of counsel**

Smith further asserts he was denied effective assistance of counsel because his attorney failed to request a jury instruction on provocation and failed to object to prosecutorial misconduct. We disagree.

To prevail on a claim for ineffective assistance of counsel, Smith must establish not only that counsel's performance "fell below an objective standard of reasonableness. . . . [¶] . . . under prevailing professional norms," but also that he was prejudiced by the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*).) To make out prejudice, a defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) Where the record on appeal " 'sheds no light' " on why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless there could be " 'no satisfactory explanation' " for counsel's actions. (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

### A.    *Provocation instruction*

Smith contends that his trial counsel's failure to request a provocation instruction, CALCRIM No. 522, violated his right to the effective assistance of counsel.[6] CALCRIM No. 522 is a

---

[6] CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the

11

pinpoint instruction that need not be given in the absence of a request. (*People v. Rogers* (2006) 39 Cal.4th 826, 877–878.) Here, any failure by counsel to request the instruction did not constitute ineffective assistance.

Smith's counsel had a legitimate tactical reason for not requesting an instruction that would focus the jury's attention on Smith's mental state at the time of the incident: his defense was that he was not present. Counsel could appropriately decline to highlight the prosecution's theory that Smith helped shoot a perceived rival. An attorney does not provide ineffective assistance by failing to request a pinpoint instruction that is inconsistent with the theory of defense. (*People v. Wader* (1993) 5 Cal.4th 610, 643.)

Further, as explained above, there was no substantial evidence that Thomas provoked Smith, or that Smith acted in the heat of passion. Thus, counsel was not ineffective for declining to request an instruction in support of that theory. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1221 [declining to request a jury instruction without evidentiary support is not ineffective assistance].) For the same reason, the absence of an instruction did not prejudice Smith, as there was no "reasonable probability that, but for [counsel's failure to request a pinpoint instruction on

---

provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.] [¶] [Provocation does not apply to a prosecution under a theory of felony murder.]"

12

provocation], the result of the proceeding would have been different."  (*Strickland*, *supra*, 466 U.S. at p. 694.)

### B.　*Evidence of prior criminal history*

#### 1.　Additional background

Prior to playing Aukeem's videotaped statement for the jury, the prosecution agreed to redact a portion of the recording that referenced Smith's first time in prison.  The tape played for the jury, however, included the statement:  "When my brother first went to the pen."  Counsel immediately recognized the error and the court excused the jury.  The prosecutor apologized, explaining that she had removed the statement from the transcript but not the video, intending to stop the video from playing the statement.

Smith's counsel moved for a mistrial due to the "overwhelming" prejudice of the reference to Smith's prior criminal history.  The court agreed there was some prejudicial effect from the jury hearing the statement, but did not believe it rose to a level warranting a mistrial.  Smith's counsel declined an admonition, explaining it would only highlight the prejudicial material, especially given that the remark had been redacted in the transcript handed out to the jurors.

#### 2.　Analysis

Smith now contends the prosecutor's error constituted prosecutorial misconduct, and his counsel was ineffective for failing to object.[7]  We again disagree.

Even if the prosecutor's error was misconduct, it neither infected " ' " ' "the trial with such unfairness as to make the

---

[7] Smith does not argue that the court abused its discretion in denying a mistrial.  Further, although Smith argued in his

conviction a denial of due process[,]" ' " ' " nor involved " ' " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 943.) At trial, Smith's counsel agreed that the prosecutor's error was unintentional, and the correct redactions to the transcript only corroborated that conclusion. Smith's attorney reasonably could have concluded that the prosecutor's omission did not constitute misconduct, and that the court would therefore have overruled any objection on that ground. Likewise, counsel's tactical decision to decline an admonition that ran the risk of highlighting the isolated statement was not unreasonable.

Smith has not demonstrated that counsel's failure to object fell below an objective standard of reasonableness, or that there is a reasonable probability that, but for counsel's allegedly deficient performance in failing to object, the result of the trial would have been different. (*Strickland*, *supra*, 466 U.S. at pp. 686–687; *People v. Williams* (1997) 16 Cal.4th 153, 215.)

## C.  *Closing argument*

Smith next contends his counsel was ineffective for failing to object to several of the prosecutor's statements during closing

---

opening brief that the failure to request an admonition does not forfeit a prosecutorial misconduct argument when an admonition would be futile, his reply brief did not address the extensive body of cases that respondent cites suggesting a curative admonishment would not have been futile in this case. (See, e.g., *People v. Jennings* (1991) 53 Cal.3d 334, 375 [curative request appropriate for single unintentional reference to prior crimes evidence].) We agree that the direct prosecutorial misconduct claim is forfeited, and therefore only address Smith's alternative ineffective assistance claim.

14

argument.  Smith asserts the statements constituted prejudicial misconduct that violated his rights to due process and a fair trial. This claim lacks merit.

### 1.    Additional background

The prosecutor's closing argument highlighted Smith's Hoover gang membership.  Specifically, the prosecutor argued:

"Mr. Smith is committed to the Hoovers, 9-Deuce.  That is his God that he prays to.  That is who he is faithful to.  That's been his life since he was 12.  Of course, he's going to spill blood for the Hoovers.  This is his parents.  This is his family.

"This is the type of person that would do that, someone who wants to cover as much of their flesh with ink that lets everybody know this is who I am.  I am a Hoover.  This is who I am.  You can't erase them.  You can't hide them.  I want you to know that I've permanently put this on my body because it is who I am and I'm willing to do anything for it.

"This is the kind of person that would do it, the kind of person that surrounds himself with Hoovers, surrounds himself with people who pray to the same God, who believe in the same religion.

"These kind of people.

"This kind of person."

The defense argued Smith was no longer an active gang member, and that the prosecution failed to establish he was at the murder scene.  The prosecutor countered that Smith had a tattoo that read, "Love family, fuck friends," and restated that "[h]is family was his gang."  The prosecutor further argued Smith's motive for killing Thomas was to retaliate for Hamilton's murder.

15

The court expressly instructed the jury that gang evidence could only be considered to determine whether Smith "had a motive to commit the crime charged" and to prove the gang allegation, judge witness credibility, or evaluate the gang expert's testimony. The jury was prohibited from considering "this evidence for any other purpose." The court further specifically admonished: "You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

### 2. Analysis

" 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions[,] there was ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.) Reversal for a prosecutor's closing argument misconduct is not warranted " 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Flores* (2020) 9 Cal.5th 371, 403 (*Flores*).)

Here, Smith focuses on the prosecutor's remarks that Smith's tattoos showed his only true family was his gang and, therefore, he was the "kind of person" that would commit this offense. Smith contends the remarks were improper appeals to the jury's emotions or prejudices.

Even assuming the arguments were improper, they did not amount to prosecutorial misconduct and any failure to object was not ineffective assistance. Given the issues before the jury, Smith's motives were within the bounds of permissible argument. (*People v. Dykes* (2009) 46 Cal.4th 731, 773–774 [argument that

16

defendant was "kind of person" to commit offense permissible]; *People v. Prince* (2007) 40 Cal.4th 1179, 1249–1250 [no misconduct where alleged propensity argument bore connection to motive].) The isolated nature of these remarks, even if improper, also indicates that any misconduct did not render the proceedings fundamentally unfair. (*People v. Hoyt, supra*, 8 Cal.5th at p. 943.)

Moreover, we can easily discern a reasoned, tactical basis for counsel not to object to the prosecutor's argument. Counsel's theory of the case was identity, as to which the gang evidence was immaterial. An objection may have highlighted any improper argument and drawn the jury's attention away from Smith's proffered defense. Thus, we cannot rule out legitimate trial strategy for counsel's lack of an objection. (*People v. Fosselman* (1983) 33 Cal.3d 572, 581 [reversal warranted "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose"].)

Finally, Smith has failed to show that a more favorable outcome was reasonably probable absent any error on the part of counsel. Smith acknowledges the gang evidence was "overwhelming." Further, the jurors received instructions—that they were presumed to follow—that the gang evidence could only be considered for a limited purpose, excluding that "defendant is a person of bad character or that he has a disposition to commit crime." (*Flores, supra*, 9 Cal.5th at p. 405 [instructions mitigated prejudice to defendant].) For these reasons, we reject Smith's argument that counsel rendered ineffective assistance by failing to object to the prosecutor's remarks.

17

**D.** *Cumulative effect*

We also reject Smith's final assertion that the cumulative effect of counsel's deficient performance deprived him of due process of law and a fair trial. As to each of Smith's claims we have concluded his counsel's performance did not constitute ineffective assistance of counsel. There was no individual or cumulative error that deprived Smith of a fair trial. (*People v. Ochoa* (1998) 19 Cal.4th 353, 470.)

**III. Assembly Bill No. 333 requires retrial of the gang and gang-related gun use enhancements**

The jury found gang and gang-related firearm allegations true. However, Assembly Bill No. 333 (2021-2022 Reg. Sess.), which took effect on January 1, 2022, made significant amendments to the gang statute, section 186.22. The legislation redefined "pattern of criminal gang activity" in five respects: (1) The last predicate offense must have occurred within three years of the date of the commission of the current alleged offense (§ 186.22, subd. (e)(1)); (2) The amended law now states that the predicate crimes must have been committed by "members," not simply "persons," as the former law stated (*ibid.*); (3) The amendments impose a new requirement that the predicate offenses "commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational" (*ibid.*); (4) Looting, felony vandalism, felony theft of an access card or account, and other identity fraud crimes no longer qualify as predicates, while other offenses (kidnapping, mayhem, torture, and felony extortion) now qualify (*ibid.*); and (5) The currently charged offense may not be used to establish the pattern of criminal gang activity (§ 186.22, subd. (e)(2)). (See *People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).)

18

Assembly Bill No. 333 also modified the definition of "criminal street gang." Previously, section 186.22 stated that a criminal street gang was "any ongoing organization, association, or group" of three or more persons, whether formal or informal. That language has been changed to "an *ongoing organized association* or group of three or more persons, whether formal or informal." (§ 186.22, subd. (f), italics added.) The previous definition required that the gang's "members *individually* or collectively engage in, or have engaged in," the pattern of criminal gang activity. (Former § 186.22, subd. (f), italics added.) Now, the word "individually" has been excised and the gang's members must "collectively" engage in, or have engaged in, the pattern of criminal gang activity. (§ 186.22, subd. (f).) The amendment also added a new subdivision that clarifies what it means to benefit the gang: "As used in this chapter, to benefit, promote, further or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

The parties here agree, as do we, that Smith is entitled to the ameliorative benefits of the amendments to section 186.22. Assembly Bill No. 333's amendments to section 186.22 apply retroactively where, as here, the defendant's convictions were not final before the amendments took effect. (*In re Estrada* (1965) 63 Cal.2d 740, 745 [absent contrary evidence, an amendment reducing punishment applies retroactively to nonfinal

19

judgments]; *Lopez, supra*, 73 Cal.App.5th at pp. 343–344; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478.)

As the Attorney General further concedes, the evidence was insufficient to establish one of the requirements of the new statute, namely that the predicate crimes benefitted the gang in more than a reputational manner. Given this evidentiary deficit, the true findings on the gang enhancement and the gang-related gun use enhancement must be reversed. The matter is remanded to allow the prosecution the option of retrying the enhancements and establishing all elements required by Assembly Bill No. 333.[8]

Smith also appears to argue that section 1109, which was added by Assembly Bill No. 333, applies to his case, and necessitates retrial of the underlying charge. Under section 1109, subdivision (a), if requested by the defense, a charged section 186.22, subdivision (b) or (d) enhancement "shall be tried in separate phases," with the question of guilt of the underlying offense to be determined first and the truth of the gang enhancement tried thereafter. The Attorney General's retroactivity concession does not extend to section 1109. Smith suggests that he is entitled to a new trial on the substantive charges because the failure to bifurcate the gang charges—and to exclude the facts relevant to such a determination—prejudiced him.[9]

---

[8] As remand for a potential retrial of the gang enhancements is required, we need not decide whether any of the other new elements of section 186.22 were met.

[9] Following the effective date of Assembly Bill No. 333, this court issued an order permitting supplemental briefing in pending cases regarding the effect of the amendments to the law.

Appellate courts have issued conflicting decisions on the issue of retroactivity of section 1109. (Compare *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090, with *People v. Burgos* (2022) 77 Cal.App.5th 550, 565–567, review granted July 13, 2022, S274743.) We need not address whether section 1109 applies retroactively here because, even assuming retroactivity, it is not reasonably probable that Smith was prejudiced by any failure to bifurcate the gang allegations. (*People v. Tran* (Aug. 29, 2022, S165998) ___ Cal.5th ___ [2022 WL 3711711, pp. 43-47]; *People v. E.H., supra,* 75 0Cal.App.5th at p. 480.)

Gang evidence in this case was highly relevant to the issues of motive and intent. "[N]othing in Assembly Bill [No.] 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges."

Smith's opening supplemental brief argues this court should vacate the gang enhancements pursuant to amended section 186.22. As noted above, the Attorney General's supplemental respondent's brief concedes that issue, but, in two footnotes, takes the position that section 1109 applies only prospectively, and, even if it is retroactive, reversal on the underlying charge is not necessary because Smith was not prejudiced by the failure to bifurcate the gang allegations. In his supplemental reply brief, Smith argues that we need not address whether section 1109 applies retroactively, in light of the Attorney General's concession that retrial of the gang enhancements is necessary. Yet, Smith paradoxically also contends he was prejudiced by the failure to bifurcate and asks this court to remand for "a new trial." We understand the latter portion of Smith's supplemental reply brief as opposing both of the Attorney General's section 1109 arguments.

21

(*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132.)  Much of the gang evidence would have been properly admitted, even in a bifurcated proceeding, given its relevance to the substantive charge.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049–1050 [gang evidence often relevant to and admissible regarding the charged offense]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168 [gang evidence is relevant and admissible when the motive is gang related; evidence related to gang membership not insulated from general rules applicable to relevant evidence].)

In addition, the jury was instructed as to the limited purposes for which it could consider the gang evidence, and we presume the jury followed that instruction.  (*People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)  Under these circumstances, we conclude the failure to bifurcate the gang allegations was not prejudicial.  We affirm the first degree murder conviction.

**DISPOSITION**

The true findings on the gang and principal gun use allegations are reversed and the sentence is vacated.  The matter is remanded with the direction to the trial court to provide the People an opportunity to retry the enhancements under the law as amended by Assembly Bill No. 333.  At the conclusion of any retrial on remand, or if the People elect not to retry the gang allegations, the trial court shall resentence Joshua Tyrece Smith in a manner consistent with this opinion.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


ADAMS, J.[*]


We concur:



EDMON, P. J.



EGERTON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


23