Filed 8/16/24  P. v. Epps CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL RAY EPPS, JR.,<br><br>    Defendant and Appellant. | H050447<br>(Santa Clara County<br>Super. Ct. No. C2008065) |

A man shot defendant Michael Ray Epps, Jr.'s daughter during a drug deal.  Epps was a marijuana producer/dealer and had supplied the drug to his daughter for sale.  After learning of the shooting from his daughter, Epps set out to find the assailant with the help of confederates.  The manhunt resulted in the shooting death of a person who had nothing to do with the failed drug deal.

At trial, Epps did not contest his involvement in the killing.  Rather, he urged the jury to find him guilty of voluntary manslaughter based on heat of passion.  The jury rejected this contention and convicted Epps of first degree murder for a willful, premeditated, and deliberate killing or a drive-by killing (Pen. Code, §§ 187, subd. (a), 189, subd. (a)[1]).

---

[1] Unspecified statutory references are to the Penal Code.

On appeal, Epps contends the trial court erred by instructing the jury that passion based on revenge does not reduce a killing to manslaughter. Epps further maintains that the district attorney violated a written pretrial agreement (hereafter proffer agreement) by using information derived from Epps's proffer interview against him at trial.

For the reasons explained below, we affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Procedural History*

The Santa Clara County District Attorney filed an amended information charging Epps with the murder of Arturo C.[2] (§ 187, subd. (a); count 1.)

The jury found Epps guilty of first degree murder based on a willful, premeditated, and deliberate killing with express malice or a murder perpetrated by means of discharging a firearm from a motor vehicle intentionally at another person outside of the vehicle with the intent to inflict death.

At a sentencing hearing, the trial court denied Epps's motion for a new trial and sentenced him to 25 years to life in prison.

### B. *Evidence Presented at Trial*

#### 1. Prosecution Evidence

Epps is the biological father of Kaila M., although she had not met him during most of her childhood. Kaila first became acquainted with Epps through his son Andre when she was 16 years old (in 2017–2018). Kaila later lived with Epps and his family in Yuba City from June 2019 to August 2019, immediately after she graduated from high school.

Kaila began selling marijuana while she was in high school, separate from her relationship with Epps. When Kaila lived with Epps in the summer of 2019, she did not

---

[2] We refer to the victim and other individuals by their first name and the first letter of their last name (and at times thereafter by their first names only) to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (10).)

sell marijuana, but she learned that Epps grew and sold marijuana and had a lot of cash, nice cars, and several houses. In August 2019, Kaila moved back to Santa Clara to live with her mother and stepfather. Kaila continued to see Epps about twice a month, and they had a good relationship.

In September or October 2019, Kaila resumed selling marijuana. Epps provided Kaila marijuana to sell, and they split the profit. Epps introduced Kaila to several people and she delivered marijuana to some of them. Kaila knew Epps's friend Venitia Hyatt. When Kaila lived with Epps, she got to know him and believed he was a nonviolent person. Kaila testified that she did not know Epps to have a reputation as a person who would commit violence "if someone messed with his [marijuana] business."

Around January 21, 2020,[3] Kaila found out that Epps had had sex with her best friend. Kaila was upset by this, and she and Epps argued about it via text messages. After January 24, Kaila did not have text communications with Epps until January 29, when she was the victim of an attempted robbery during a drug deal in which she was selling Epps's marijuana.

On the night of January 29, Arturo (the murder victim) attended a San Jose Sharks game with some coworkers. Coincidentally, Kaila set up a marijuana deal that night with a different man through her social media account. The marijuana buyer provided an address in San Jose (on De Rose Way, near Southwest Expressway and Leigh Avenue) and a photo of his identification (ID) card. Kaila requested this information from the buyer to protect herself. She knew that selling marijuana was dangerous, and she risked being robbed or hurt.

When Kaila and her girlfriend Ariana M. arrived at the De Rose Way address, the buyer attempted to rob Kaila and shot her. Kaila drove off. Kaila had "a lot" of marijuana supplied by Epps in her car. She posted about the shooting on social media

---

[3] Unless otherwise indicated, all dates were in 2020.

3

(including the man's photo ID and his social media account) and messaged people for help in finding the man.

Around 8:35 p.m. on January 29, Kaila called Epps using FaceTime. The dash cam in Kaila's car captured the audio of the call as Kaila drove toward a hospital.[4] Kaila used the video feature of FaceTime to show Epps her injury and to confirm that she had in fact been shot. Epps told Kaila to go to the hospital as soon as possible. Kaila sent Epps the buyer's address and ID card. In Kaila's opinion, Epps sounded calm and remained calm after learning she had been shot.[5]

Epps's friend Richard M. and Epps's cousin Antione S. visited Kaila at the hospital. Kaila was treated and released around 12:05 a.m. on January 30.

Between around 8:35 p.m. on January 29 (when Epps learned that Kaila had been shot) and approximately 1:15 a.m. on January 30 (when Arturo was shot), Epps had contact with several people, some of whom lived in the San Jose area. The people contacted included Epps's friend Jovaune Zermeno, Venitia Hyatt, Hyatt's daughter Sade M., Kaila's girlfriend Ariana M., Richard, and Antione. In addition, Epps used Google Maps to locate the address Kaila provided to him as the buyer's address.

---

[4] The dash cam recording was played for the jury, and a transcript (which was not admitted into evidence) is included in the appellate record. The transcript includes the substance of five conversations that Kaila and Epps had prior to her arrival at the hospital. Both parties cite to the transcript in their appellate briefing.

[5] The transcript of the dash camera recording indicates that during the first FaceTime call, Epps looked at Kaila's injury and said it "look[s] like a graze wound." Epps asked Kaila who she was "dealing with" and Kaila promised to send Epps the man's information. Epps also said he was in "the middle of something" and would call Kaila back in five minutes. When they spoke again a short time later, Epps urged Kaila to send him the man's information "right now." In addition, Epps asked Kaila "how did everything go down?" Kaila said, among other things, "I pulled up, I told him I was here and [] he came out." Epps told Kaila to falsely state that someone had tried to carjack her and shot her, and not to say that she was selling marijuana. When Kaila asked what she should do with the marijuana that she had in her car, Epps told her to put it in the trunk.

4

Ariana and Epps spoke after Kaila was released from the hospital. They discussed the failed drug deal. Epps asked Ariana whether she had seen the buyer come out of an apartment. According to Ariana, Epps's tone of voice sounded normal, and he was curious about what had happened.

Epps sent the buyer's photo to Sade (Hyatt's daughter) and asked if she knew him. Sade did not know the man but told Epps she would ask around to see if anyone did. When Sade asked Epps if Kaila was okay, he said she was fine. Sade provided the buyer's photo to Hyatt and others. Epps told Sade that he was on his way to San Jose. According to Sade, during a call that occurred as Epps drove to San Jose, Epps sounded upset, anxious, and worried about Kaila, but he calmed down by the end of the call. Sade testified that she did not know Epps to have a reputation for violence with respect to his marijuana business. Sade further testified that Hyatt spoke with Epps after Kaila was shot and Hyatt told Sade " 'they were going to take care of it.' " Hyatt also sent messages to multiple people seeking information about the man who shot Kaila.

Cell phone records and data from Epps's Cadillac SUV suggested that Epps and his friend Zermeno drove together in the SUV from Yuba City to San Jose (leaving Yuba City after 10:00 p.m. on January 29).[6] At 12:50 a.m., Epps's cell phone arrived in the vicinity of Southwest Expressway and Leigh Avenue in San Jose. At 12:51 a.m., Zermeno did an internet search to find out who lived at the De Rose Way address. Epps's phone remained in that area until around 1:20 a.m. (before returning to Yuba City).

Around the same time on January 30, Arturo (the murder victim) happened to be meeting with a woman near Southwest Expressway and Leigh Avenue. Surveillance cameras captured Arturo's vehicle in a store parking lot. A vehicle associated with Hyatt entered the parking lot around 1:00 a.m. Phone records showed that Epps and Hyatt

---

[6] Yuba City is about a "30, 40-minute drive north of Sacramento."

5

exchanged phone calls between 1:09 a.m. and 1:14 a.m. In addition, a Buick LeSabre sedan associated with Epps's friend Richard and a Range Rover associated with Hyatt's friend Mark R. appeared in the parking lot.

Around 1:13 a.m., Arturo began driving out of the store parking lot. Epps's SUV followed Arturo's vehicle. After Arturo exited the parking lot, he drove north on Southwest Expressway and turned onto Leigh Avenue. Arturo's vehicle and Epps's SUV proceeded toward a strip mall on Leigh Avenue and pulled into adjacent parking spaces. Arturo then backed up and began driving away. Epps's SUV tried to cut off Arturo's vehicle to prevent it from leaving. Arturo drove out of the parking lot and accelerated. Epps's SUV accelerated after him and pulled alongside the driver's side of Arturo's vehicle for one or two seconds.

An eyewitness heard gunshots as he sat outside his apartment on Leigh Avenue. He also heard car engines "racing" and a loud car crash. He saw an SUV and a sedan speeding away from the scene. The eyewitness approached the crashed vehicle and found Arturo in the driver's seat. Arturo was unresponsive and bleeding badly from the back of his head.[7]

The police arrived and removed Arturo from his vehicle. An ambulance transported Arturo to the hospital. His vehicle's rear window was shattered, but no other bullet strikes were located. The police found seven 9mm bullet casings at the scene. A forensic analysis revealed that all seven bullet casings seemingly were fired by a single firearm. The police never recovered the firearm.

On the morning of January 30, Kaila and Epps spoke. Epps asked Kaila how she was doing and told her to look at the news about a shooting in San Jose. In addition,

---

[7] In closing argument, the prosecutor asserted that Epps and Zermeno were inside Epps's SUV but conceded that "we do not know for certain if Michael Epps is the driver who is accelerating, chasing down [Arturo] so that Zermeno can fire those shots, or if it's Zermeno driving Michael Epps'[s] car and Michael Epps himself is the one pulling the trigger again and again until they kill [Arturo]."

Epps sent Kaila a lawyer's phone number in case she might need it. At trial, Kaila denied that Epps had told her that others were involved and that he saw the man, followed him, stopped next to him, asked him " 'What's up?' " and shot him as he tried to drive away. Kaila also testified that she previously lied to the police about Epps's statements to her. A detective testified that Kaila had admitted during a police interview that Epps said he saw the man and asked him what was up. Further, during the interview, the detective asked Kaila whether Epps made it " 'pretty clear' " that he was responsible for the news story and Kaila replied, " 'I guess so.' "

Arturo died on February 12 due to complications from the gunshot wound to the back of his head.

### 2. Defense Evidence

The defense called five relatives and the mother of one of Epps's children to testify about Epps's character. The defense witnesses variously described Epps as a loving and devoted father who wanted the best for his children. The witnesses further testified that they did not know Epps to be a violent person or hear him speak about wanting to inflict violence on anyone.

The prosecutor cross-examined the defense witnesses about their lack of awareness of Epps's illegal marijuana business (including that he had supplied marijuana to Kaila) and their minimal contact with Kaila. In addition, the prosecutor elicited from Epps's aunt that she had not heard that after Epps was arrested, the police stopped his son Andre leaving home with a firearm that had a fake serial number. The prosecutor also elicited from Epps's uncle that Epps had two prior misdemeanor convictions for criminal threats.[8]

---

[8] The parties stipulated that on June 3, 2021, police officers saw Andre leaving the family's home in Yuba City. After stopping Andre's car, the police found a gun with an altered serial number. The parties also stipulated that Epps had two misdemeanor convictions from 2001 for criminal threats (§ 422).

## II. DISCUSSION

Epps raises two claims on appeal. He contends the trial court erred when instructing the jury on voluntary manslaughter. He further alleges a violation of a pretrial proffer agreement by the district attorney. We address his claims in turn.

### A. *Instruction on Revenge*

The trial court instructed the jury that "[p]assion will not reduce a killing to manslaughter if based on revenge" (hereafter revenge instruction).

Epps contends the trial court erred in adding this revenge instruction to the pattern jury instruction on voluntary manslaughter for heat of passion (CALCRIM No. 570). He argues that "the traditional exclusion of revenge as a permissible basis for heat of passion is inapplicable when the provocation involves an assault with a deadly weapon upon a family member." He further maintains that by excluding " 'revenge,' which included all retaliation, the court here improperly removed heat of passion from the jury's consideration in this case under the facts of this case."

The Attorney General responds that Epps forfeited his instructional error claim by failing to object to or request a modification of the revenge instruction. The Attorney General argues further that the instruction was legally correct, and, in any event, the alleged instructional error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

### 1. Additional Background

Pretrial, Epps, through his defense counsel, filed a "brief on the legal standards of voluntary manslaughter" and requested an instruction on voluntary manslaughter based on heat of passion.

During trial, at a conference on the jury instructions, the trial court stated its intent to instruct on voluntary manslaughter based on heat of passion using CALCRIM No. 570. The court further stated: "The [c]ourt is going to add some additional language to this instruction, primarily based on *People v. Fenenbock* [(1996)] 46 Cal.App.4th [1688].

8

And the addition the [c]ourt is going to include will be right above the last paragraph on this instruction [and] will state, 'Passion will not reduce a killing to manslaughter if based on revenge.' And we had some discussions about that language informally. I'm not sure if either counsel wishes to comment additionally, but with that modification, I am inclined to give this instruction." Defense counsel did not object to the court's proposed addition or request any modification to it.

The trial court provided the following written instruction to the jury regarding voluntary manslaughter:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] [and] [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the

9

provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"*Passion will not reduce a killing to manslaughter if based on revenge*.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."[9] (CALCRIM No. 570, modified; italics added.)

In closing argument, the prosecutor asserted that Epps murdered Arturo C. "for revenge, to retaliate for the attempted robbery and the shooting of Kaila [M.] that had happened four hours and 40 minutes earlier." When arguing more specifically against voluntary manslaughter, the prosecutor told the jurors that "revenge is not a passion. A desire for revenge is not a passion for voluntary manslaughter." The prosecutor further asserted that there was "enough time for a person of average disposition to cool off" and Epps did not have "some violent reaction focused on his concern for" Kaila. Instead, he had "his own motivations, coming down [from Yuba City] to retaliate to kill, using reasoning and judgment."

---

[9] The reporter's transcript indicates that when reading this instruction to the jury, the trial court said passion will not reduce "*the* killing" (italics added) to manslaughter if based on revenge (rather than "a killing"). Neither party notes this discrepancy nor makes any argument based on it. Further, the trial court stated that it would provide copies of the written instructions to the jurors for their deliberation. We therefore infer that the jury received the written instructions. When a "discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

10

In response, Epps's defense counsel characterized the prosecutor's theory as one in which the offense was "[a] calculated, cold-blooded act of revenge and retaliation to protect Michael Epps'[s] business" along with " 'something to do with his daughter who was shot.' " Counsel countered that theory arguing, "Our theory, and what you [the jurors] should have a reasonable doubt about, is that Mr. Epps did act rashly, under the influence of intense emotion. It obscured his reasoning for judgment, which is exactly what the definition of voluntary manslaughter is." Counsel asserted that Epps was not motivated to protect his business or by revenge. Rather, "he didn't have a motive. There was no message to be sent by finding this San Jose guy that tried to rob and shoot Kaila. No business purpose for that whatsoever. [¶] And we also know that Mr. Epps had too much to lose. Mr. Epps had, what sounds like, a very successful, illegal marijuana business." Additionally, counsel argued that Epps was not the shooter and "never intended to kill."

In rebuttal argument, the prosecutor asserted that Epps committed the offense "for a reason. He does it to retaliate, he does it for revenge, and it's tied to the marijuana, that he has his daughter in this dangerous situation, and what they both know could happen does. He has to show he'll protect her, and it goes to their complicated relationship. He's earning back that trust, and in his way, this is how [he] thinks he earns back that trust, by killing the man who shot her." The prosecutor argued further that voluntary manslaughter was "not applicable" under the evidence and that the killing "was done in retaliation, and retaliation is murder."

    2. <u>Legal Principles</u>

        a. Voluntary Manslaughter – Heat of Passion

"California law separates criminal homicide into two classes: the greater offense of murder and the lesser offense of manslaughter. [Citation.] Murder is defined as 'the unlawful killing of a human being . . . with malice aforethought' [citation], while manslaughter is defined as 'the unlawful killing of a human being without malice'

11

[citation]. Thus, the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.' [Citation.] Malice exists when 'an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" [citation], or with awareness of the danger and a conscious disregard for life.' " (*People v. Schuller* (2023) 15 Cal.5th 237, 252 (*Schuller*).)

"A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted (*Beltran*); see also *People v. Vargas* (2020) 9 Cal.5th 793, 828 ["A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought."].)

In other words, "[h]eat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53 Cal.4th 735, 759, citing *People v. Moye* (2009) 47 Cal.4th 537, 549–550.) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.' " (*Enraca*, at p. 759.) "No specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or

12

enthusiastic emotion" ' " [citations] *other than revenge.*' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108 (*Lasko*), italics added.)  Further, " '[i]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion." ' " (*Beltran*, *supra*, 56 Cal.4th at p. 951; see also *Moye*, at p. 550.)

The prosecution must disprove heat of passion beyond a reasonable doubt to establish the element of malice.  (*Schuller*, *supra*, 15 Cal.5th at p. 253; see also *People v. Rios* (2000) 23 Cal.4th 450, 462.)

### b.  Jury Instruction Requirements and Appellate Review

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.]  That duty extends to instructions on the defendant's theory of the case, 'including instructions "as to defenses ' "that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' " (*People v. Townsel* (2016) 63 Cal.4th 25, 58.)  "[O]nce a trial court undertakes to instruct on a legal point, it must do so correctly."  (*Ibid.*)

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]  But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law."  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012; see also *People v. Campbell* (2020) 51 Cal.App.5th 463, 499.)

" 'A claim of instructional error is reviewed de novo.  [Citation.]  An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.' " (*People v. Ramirez* (2023) 98 Cal.App.5th 175,

13

218.)  " ' "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 313 (*Gomez*).)

### 3.  Analysis

Epps acknowledges that his defense counsel did not object to the revenge instruction.  Notwithstanding the Attorney General's assertion of forfeiture, we reach the merits of Epps's claim of error because he contends the instruction "was legally incorrect under the facts of this case" and affected his substantial rights.  (See *People v. Morales* (2021) 69 Cal.App.5th 978, 995, fn. 4 [reviewing defendant's argument "that the instruction was an incorrect statement of the law if the instruction affected his substantial rights, meaning it was reversible error under" *Watson*]; *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604; *Gomez*, *supra*, 6 Cal.5th at p. 312; § 1259.)

Regarding the merits of Epps's claim, we are not persuaded that the revenge instruction amounts to an incorrect statement of the law.  The California Supreme Court has "long recognized that 'the fundamental of the inquiry [into whether provocation has negated malice] is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear *and never, of course, the passion for revenge*—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People v. Rich* (1988) 45 Cal.3d 1036, 1112, quoting *People v. Logan* (1917) 175 Cal. 45, 49, italics omitted & added; accord, *Beltran*, *supra*, 56 Cal.4th at pp. 947–949 & fn. 9.)

The trial court's revenge instruction accords with the principle that "a desire for revenge cannot objectively satisfy the provocation requirement." (*People v. Souza* (2012) 54 Cal.4th 90, 117; see also *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254,

14

301; *People v. Burnett* (1993) 12 Cal.App.4th 469, 478 ["Heat of passion may not be based upon revenge."].)  Because revenge is insufficient as a matter of law to support a finding of heat of passion, the court's direction to the jury that passion "based on revenge" will not reduce a killing to manslaughter accurately stated the law.

Epps does not cite any authority that demonstrably supports his assertion that "the traditional exclusion of revenge . . . is inapplicable when the provocation involves an assault with a deadly weapon upon a family member."  Although an assault on a family member could possibly be sufficient provocation to support heat of passion (see *People v. Brooks* (1986) 185 Cal.App.3d 687, 694 (*Brooks*); *People v. Elmore* (1914) 167 Cal. 205, 211), revenge even for an attack on a family member necessarily implicates some degree of deliberation and reflection and is not the type of unconsidered reaction required for voluntary manslaughter.  (See *Lasko*, *supra*, 23 Cal.4th at p. 108.)

Epps's reliance on *Brooks* for his assertion that the revenge exclusion does not apply when a family member is involved is misplaced.  In *Brooks*, the defendant's brother was stabbed to death at on a city street at 2:00 p.m.  (*Brooks*, *supra*, 185 Cal.App.3d at p. 690.)  At the crime scene, defendant, "in a very excited, upset state, was running around talking to people, and trying to find out who killed his brother."  (*Id*. at p. 691.)  At 4:00 p.m., in the same location where his brother had been stabbed, after having heard about the identity of his brother's killer, defendant confronted the purported killer, yelled " 'Where is your knife?' " and shot him five times.  (*Id*. at p. 690; see also *id*. at pp. 691–692.)  The *Brooks* court decided that the murder of a family member is legally adequate provocation for voluntary manslaughter.  (*Id*. at p. 694.)  The court further concluded there was substantial evidence—namely the eyewitness accounts of the defendant's behavior at the crime scene—that the defendant had acted in the heat of passion when confronting his brother's killer.  (*Id*. at p. 696.)  In reaching the latter conclusion, the *Brooks* court mentioned the longstanding principle that " 'passion for revenge' " cannot serve as the predicate for heat of passion.  (*Id*. at p. 694.)  The court did

15

not suggest anywhere in its analysis that heat of passion sufficient for voluntary manslaughter could be based on revenge when a family member is assaulted. (See *id*. at pp. 694–696.)

In adding the revenge instruction to CALCRIM No. 570, the trial court aptly clarified that revenge, even if passionately felt, is not the type of passion encompassed by voluntary manslaughter. We conclude the trial court's instruction was proper and did not remove heat of passion from the jury's consideration in determining Epps's guilt of the murder charge.

### B. *Alleged Violation of Proffer Agreement*

Epps contends the district attorney violated a pretrial proffer agreement in which the district attorney had promised not to use Epps's postarrest police interview statements against him at trial. Epps claims the trial prosecutor improperly questioned Ariana M. based on the police interview and exploited that testimony when arguing that Epps committed the offense with reasoning and judgment, not in the heat of passion. Epps further contends the trial court erred in finding the alleged error harmless, arguing that the error contributed to the jury's murder verdict and rejection of his heat of passion defense.

The Attorney General responds that Epps forfeited his claim of error by failing to object during Ariana's testimony and the prosecutor's closing arguments. The Attorney General further asserts that even if Epps's claim were not forfeited, it fails because Epps has not shown that the prosecutor's questions and arguments violated the proffer agreement. Lastly, the Attorney General contends that even if a violation of the agreement occurred, the error was harmless beyond a reasonable doubt because the jury's verdict was not attributable to the error.

#### 1. Additional Background

In June 2020, the police arrested Epps for murdering Arturo.

16

In October 2020, Epps entered into a written proffer agreement with the district attorney in which he agreed to be interviewed. The proffer agreement states that if the district attorney chose not to "make an offer to enter into a negotiated plea" with Epps, the district attorney could "not use any statement given pursuant to th[e] agreement against [Epps] in the case-in-chief in any criminal prosecution" (with certain immaterial exceptions). The district attorney, however, was permitted to use Epps's statements "for any investigatory purpose" but could not use any additional information developed by further investigation against Epps (again, with immaterial exceptions).

On October 7, San Jose Police Department detectives interviewed Epps for over an hour. During the interview, Epps admitted that he had talked to Kaila's girlfriend Ariana and "asked her, 'Are you sure you've seen this guy come out of that house?' and asked her a couple of time[s,] 'Is that the – did you see that guy come out of the house?' "[10]

At Epps's trial, Ariana testified for the prosecution under subpoena. On direct examination, the prosecutor questioned Ariana about the phone conversation she had with Epps after midnight on January 30. Ariana testified that she had missed Epps's initial call to her that night and called him back.[11] The prosecutor asked to "tell us about that call." Ariana responded, "I told him what happened. And when he asked what happened, I told him what happened." The prosecutor asked further, "When you say he asked what happened, what do you mean?" Ariana explained that Epps had asked "[w]hat happened [] with the drug deal." The prosecutor followed up by asking "what did you tell him about what had happened?" Ariana responded, "[Kaila] got shot while

_____

[10] As mentioned *ante* (pt. I.B.1.), while Kaila was driving to the hospital after being shot, she told Epps (in response to his questioning) that the shooter "came out" after she had informed him of her arrival at the De Rose Way address.

[11] Phone records indicated that Epps had called Ariana at 12:11 a.m. (for four seconds), and Ariana called Epps back at 12:35 a.m. The latter call lasted for 149 seconds.

she was making a drug deal, basically.  Just like the gist of what happened.  He kind of already knew."  The prosecutor continued:

"Q.  Did he ask you questions about it?

"A.  Not really.

"Q.  So after you told him the general gist of what happened, what was next on the call?

"A.  Um, nothing.  That was it."

Next, the prosecutor asked Ariana about "Epps'[s] tone on the call" and how his "voice sound[ed]" Ariana responded, "Um, normal.  Like, he was just curious as to what happened."  The prosecutor continued:

"Q.  Was he asking you questions about where the man had come out of -- if you had seen him come out of an apartment?

"A.  Yes.

"Q.  And was he asking you if you had been at [] De Rose in front of an apartment?

"A.  What?

"Q.  Was he asking about the address that you were at with Kaila when she was robbed?

"A.  Um, I don't know.

"Q.  But you remember him asking about where the man had come from?

"A.  Um-hum.

"Q.  Is that a 'Yes'?

"A.  Yes.

"Q.  Did Michael Epps say anything about why he wanted to know that?

"A.  No.

"Q.  Did you ask?

"A.  No.

18

"Q. And did you ask him why he wanted to know this information? Why he was calling you after midnight?

"A. No.

"Q. Did he say anything about where he was?

"A. No.

"Q. Where he was going or not?

"A. I don't think so. I don't know.

"Q. Did he ask you if you had any more information or pictures about the man?

"A. I don't know.

"Q. Did you tell him you don't know any more about who it is?

"A. I probably did.

"Q. And if you said that, it would have been because he was asking?

"A. Hmm?

"Q. If you had said it, it would have been because he was asking about it?

"A. Well, yeah. Part of what happened, I don't know who it was."

Defense counsel did not object to any of the questions posed by the prosecutor concerning Ariana's conversation with Epps.

In closing argument, the prosecutor mentioned Ariana's testimony about the phone call when arguing to the jury that Epps's actions after learning Kaila had been shot reflected "reasoning and judgment," not heat of passion. The prosecutor said, "You heard that from Ariana M[.] as well. I asked her about the tone, and she didn't say, 'Oh, he was' -- 'I don't know. He was really hard to understand. He was disjointed in his thinking. He sounded just off the wall.' No. She described him as curious. What was he curious about? Where the man had come out from. And that also is reasoning and judgment, because he's thinking, why would this man at [] De Rose [Way] give his own address? Where did he come out from? Did you see him come out from an apartment, right? He's thinking, using reasoning and judgment, that would this guy really set up a

19

robbery in front of his own house? And so he's questioning Ariana M[.], which is why she thinks he sounds curious. Reasoning and judgment."

In rebuttal argument, the prosecutor mentioned Ariana's testimony when asserting that defense counsel had not provided "an alternative reasonable explanation" for Epps's various acts including "calling Ariana M[.] to ask where did the guy actually come out from." The prosecutor also reiterated that Epps had "call[ed] Ariana to ask her about that man, where he came out. This is all evidence of [Epps's] reasoning and judgment that night."

After the jury found Epps guilty of first degree murder, Epps (through different defense counsel) filed a motion for new trial (§ 1181) (motion). Epps requested that the trial court grant him either a new trial or reduce his conviction to voluntary manslaughter. Epps alleged that the prosecutor had violated the proffer agreement and, in turn, his due process rights by using his police interview to question Ariana about whether he had inquired about the shooter and by arguing based on that testimony that he had acted with reasoning and judgment. Epps claimed that "[d]uring the proffer interview, [he] stated that Kaila and Ariana told him that, on the night the man shot Kaila, they never actually saw the man exit the residence at De Rose Way." Epps argued: "The prosecutor only knew to ask these questions of Ariana due to Mr. Epps's proffer statement regarding the girls telling him they did not see the man exit the residence. [Citation.] There was no evidence that Kaila or Ariana told law enforcement that Mr. Epps had asked questions regarding where the man came from. Indeed, Ariana specifically testified that Mr. Epps had *not* asked any questions."

The district attorney opposed Epps's motion. The district attorney argued Epps had forfeited any challenge to the questioning of Ariana by failing to object during the examination. The district attorney further argued that no violation of the proffer agreement occurred because the prosecutor's questions about whether Epps had inquired about the apartment from which the man may have exited were based on reasonable

20

inferences from the trial evidence.  The district attorney maintained the prosecutor's inquiry "was a logical question to ask a reluctant witness [who was] providing only vague and inconsistent answers to more general questions and not further investigation using Mr. Epps's statements."  Additionally, the district attorney asserted that any violation of the proffer agreement was harmless beyond a reasonable doubt because the prosecutor's reference to Ariana's testimony during closing argument was brief and there was abundant evidence and argument that Epps had not acted in the heat of passion.

At a hearing on Epps's motion, defense counsel argued, inter alia, that forfeiture should not apply because the alleged error affected Epps's fundamental right to due process.

In denying Epps's motion, the trial court found that "the [d]efense forfeited its challenge" to the prosecutor's conduct by failing to object.  In the alternative, the court assumed arguendo that Epps's challenge was not forfeited.[12]  The court further assumed arguendo that a violation of the proffer agreement had occurred, saying:  "Based on the [c]ourt's review, it appears *if there was a violation of the proffer agreement*, it was based on essentially one question asked two or three times.  Ariana was asked, 'Was he asking questions about where the man had come out of if you had seen him come out of an apartment?'  Answer:  'Yes.'  Three questions later, Question:  'Do you remember him asking about where the man had come from?'  Answer:  'Uh-huh.'  'Is that a "Yes"?'  Answer:  'Yes.'  Followed by, 'Did Michael Epps say anything about why he wanted to know that?'  Answer:  'No.' "  (Italics added.)  The court noted that other evidence had been presented at trial regarding Epps's "calm tone and reaction to the shooting of

---

[12] In doing so, the trial court said, "However, assuming the [d]efense is correct -- and their position is well-taken -- that the failure to object cannot be forfeited because the questions resulted in a due process violation.  The [c]ourt is going to address the [d]efense's motion for new trial."

Kaila." In addition, the court described the prosecutor's manifold arguments to the jury "regarding reasoning, judgment, and heat of passion."

The trial court ruled as follows: "Based on the [c]ourt's independent review of all of the evidence, the [c]ourt finds that any violation by the People of the proffer agreement or error was harmless beyond a reasonable doubt. Furthermore, the [c]ourt finds the guilty verdict rendered in this trial was surely unattributable to any violation of the proffer agreement or error. The People provided extensive evidence regarding the issue of heat of passion, and Mr. Epps responding, after learning that Kaila had been shot, calmly, and not in the heat of passion. [¶] Therefore, the motion for a new trial pursuant to Penal Code [s]ection 1181[, subdivision 5] is denied. Furthermore, based on the [c]ourt's independent review, the request that the [c]ourt reduce the murder conviction to voluntary manslaughter pursuant to Penal Code [s]ection 1181[, subdivision 6] is denied. The [c]ourt find[s] that the evidence presented at trial was sufficient beyond a reasonable doubt to sustain the verdict of murder."

### 2. Legal Principles

"Proffer agreements are a type of contract. As such, they ' "may be analyzed in terms of contract standards," ' although 'courts will not "follow blindly the law of contracts" where that body of law does "not provide a sufficient analogy and mode of analysis." ' [Citation.] Although we independently review the plain text of agreements [citation], we review for substantial evidence whether 'the parties entered into an agreement,' whether the plain text of the agreement was modified or defined by conflicting extrinsic evidence, and 'whether a party carried through with its part of the agreement.' " (*People v. Palacios* (2021) 67 Cal.App.5th 184, 190.)

A prosecutor cannot use a defendant's statement in violation of a promise not to do so. (*People v. Quartermain* (1997) 16 Cal.4th 600, 616–623 (*Quartermain*).) Because a prosecutor's promise induces a defendant to waive his constitutional right to

22

remain silent, fundamental fairness and constitutional due process require a prosecutor to adhere to the promise.  (*Id*. at p. 620.)

When a prosecutor violates a proffer agreement by improperly using the defendant's statement at trial, the court "must decide whether the error was harmless . . . beyond a reasonable doubt—that is, whether it is clear beyond a reasonable doubt that use of the statement did not contribute to the verdict."  (*Quartermain*, *supra*, 16 Cal.4th at p. 621, citing *Chapman v. California* (1967) 386 U.S. 18, 24.)  "Under this test, the appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.' "  (*Quartermain*, at p. 621.)

" 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.'  [Citations.]  ' "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' "  (*People v. Thompson* (2010) 49 Cal.4th 79, 140; see also *People v. Peoples* (2016) 62 Cal.4th 718, 792–793 ["We review the trial court's rulings on prosecutorial misconduct for abuse of discretion."].)

### 3.  Analysis

At trial, Epps's defense counsel did not object to or request an admonition regarding the allegedly improper questioning of Ariana or the prosecutor's closing arguments.  Thus, Epps's claim of error is forfeited.  (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 919; *People v. Perez* (2018) 4 Cal.5th 421, 450.)  Although Epps raised his proffer agreement claim in his motion for new trial, that is insufficient to preserve the claim for appeal.  (See *People v. Adams* (2014) 60 Cal.4th 541, 577 [prosecutorial misconduct challenge forfeited for lack of timely objection when raised for first time in postverdict motion for new trial].)

Forfeiture notwithstanding, the record supports the trial court's conclusion that any violation of the proffer agreement based on the prosecutor's questioning and closing arguments was harmless beyond a reasonable doubt. In reaching its decision, the court identified the allegedly improper questions and noted that the prosecution had presented other evidence "relating to [Epps's] calm tone and reaction to the shooting of Kaila." Epps makes no persuasive argument that the court's finding in this regard is unsupported.

Furthermore, the trial court catalogued the evidence and argument that, apart from the questioning of Ariana, demonstrated Epps had not acted in the heat of passion. The information included that "four hours and 40 minutes" elapsed between the time Kaila told Epps she had been shot and the shooting of Arturo, Epps knew Kaila's gunshot wound was not serious and she was able to drive herself to the hospital, Epps saw fit to end his first FaceTime call with Kaila because he was "in the middle of something," Epps provided directions to Kaila about concealing the marijuana she possessed and the true nature of the shooting, Epps asked for the shooter's identifying information, Epps did not speak with Kaila after she arrived at the hospital, Epps made "over 42 telephone calls to 14 different people, and over 40 text messages with 12 different people" before Arturo was shot, and Epps had "a number of people in San Jose helping him figure out what happened and where the suspect shooter is located."

Based on the totality of the evidence and the prosecutor's closing arguments, the trial court's finding of harmlessness was not a manifest abuse of discretion. Although the prosecutor mentioned Ariana's testimony about Epps's inquiries regarding the shooter's potential connection to the address he had provided, there was copious other evidence (which the prosecutor also discussed) proving that Epps had tried to obtain information about and locate the man who shot Kaila. Ariana's testimony was a small piece in a large puzzle comprising a plethora of proof that Epps, with deliberation and reflection, systematically engaged in a manhunt that resulted in the killing of an innocent man. For these reasons, we conclude the trial court did not abuse its discretion in denying Epps's

24

new trial motion and reasonably decided that " 'the guilty verdict actually rendered in this trial was surely unattributable to the error.' " (*Quartermain*, *supra*, 16 Cal.4th at p. 621, italics omitted.)

### III.  DISPOSITION

The judgment is affirmed.

_____
                                   Danner, J.



WE CONCUR:




_____
Greenwood, P. J.




_____
Grover, J.




**H050447**
*People v. Epps*